[No. 10378–4–I.   Division One.   August 16, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. LUIS M. LAVARIS, *Appellant.*

*David Wohl* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jeffrey Baird, Deputy,* for respondent.

WILLIAMS, J.—Luis M. Lavaris was accused of first degree murder and found guilty as charged in a trial to the court with a jury. He appeals from the judgment entered on the verdict raising issues concerning the admission of his confession, references to a polygraph test and hearsay evidence. We affirm.

Luis Lavaris, Francisco Castro and the victim were at Betty Haro's apartment in Seattle on the evening of July 8, 1980. In the course of the evening, the victim and Haro fell asleep. Haro awoke to find Lavaris and Castro standing over the victim's wounded body. Lavaris had stabbed the victim several times with a large knife, causing his death. Castro was convicted of first degree murder by a jury on October 10, 1980, for his participation in the crime.

Several months after the incident, Lavaris was arrested in Oregon and extradited to Washington, being placed in the King County Jail. On February 19, 1981, at about 2 p.m., Detectives Gruber and Crawford of the Seattle Police Department met Lavaris in the reception area of the jail, their intention being to take him to their office across the street to talk about the murder if Lavaris wished to do so. According to one of the detectives, when this was explained to Lavaris, he stated right off that:

> It was right at that time that Mr. Lavaris said that he was willing to talk to us. He stated right off that he didn't want somebody else getting in trouble for something he did; referring to Mr. Castro.

The two detectives and Lavaris then went to the office where they waited for almost an hour for an interpreter. Although the detectives determined that Lavaris could

speak and understand English, they believed that the administration of rights should be done in both English and Spanish, and the interview conducted in both languages also. *Miranda*[1] and constitutional rights were explained when the interpreter arrived about 3 p.m. Lavaris then gave a complete account of the murder, his report being reduced to writing and acknowledged as correct 4 days later.

At a pretrial suppression hearing, the court decided that the State had not shown by a preponderance of the evidence that the statements Lavaris made before being advised of his rights were spontaneous and, hence, were inadmissible. The court suppressed anything Lavaris said before 3 p.m. but declared admissible everything he said thereafter.

The first issue is whether the conditions that rendered the prewarning statements inadmissible carried over to invalidate Lavaris' subsequent confession. *United States v. Toral,* 536 F.2d 893 (9th Cir. 1976).

█ Application of the principle that an intervening *Miranda* warning may not insulate a subsequent confession from the taint of prior unwarned interrogation caused reversal in *State v. Erho,* 77 Wn.2d 553, 463 P.2d 779 (1970). The situation and decision of the court is stated in the opinion as follows:

> Here, the trial court found, and we agree, that the warning which the officer testified was given at the time of arrest was inadequate. *State v. Tetzlaff,* 75 Wn.2d 649, 453 P.2d 638 (1969). It failed to advise the appellant that anything he said might be used against him and that, being an indigent, he was entitled to appointed counsel if he so desired prior to any questioning. Despite these inadequacies, however, the officers in the patrol car questioned him and elicited an admission of his participation in the offense involved. This was later, within a very short time and without a break in continuity, reduced to written form. As heretofore indicated, the trial court

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

excluded the oral admissions but admitted the written statement.

We are satisfied, upon the record as it stands, that the written statement is but the direct and derivative product of the oral admissions. It perforce suffers from the same infirmities the trial court found infected the oral statements. In short, by his oral admissions the appellant had "let the cat out of the bag by confessing" and was not "thereafter free of the psychological and practical disadvantages of having confessed." He could not get the cat back in the bag, for the secret was out. *United States v. Bayer,* 331 U.S. 532, 91 L. Ed. 1654, 67 S. Ct. 1394 (1947); *Westover v. United States,* 384 U.S. 436, 494, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *Harrison v. United States,* 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968). Thus, the voluntariness and admissibility of his written statement was compromised.

*State v. Erho,* at 560–61. In this case the evidence is that at the very outset Lavaris volunteered that he was the murderer. The account of what followed is given in the testimony of Detective Gruber:

Q [By defense counsel] Was there any reason that you could not have waited for [the interpreter] to come over before you started questioning [Lavaris] about the incident?

A Well, you would have to understand the tone of the whole meeting. Mr. Lavaris was very eager to talk about the incident.

Q And you were very eager to question him, were you not?

A Mr. Lavaris did way more talking than I did questioning.

Q Was there any reason why you could not have waited until [the interpreter] came over at three o'clock before you started taking down a statement in a case of that serious nature?

A I didn't take any notes at all during that . . . conversation. It was strictly sitting there and basically talking.

Q My question, Officer, was whether or not you could have waited for [the interpreter]. That would not have posed any hardship to you.

A No, it wouldn't have.

Q Now, did Mr. Lavaris indicate to you a time or two that he didn't want to talk to you any more?

A No.

Q He never indicated that to you?

A No.

Q Before [the interpreter] had a chance to advise Mr. Lavaris of his rights, Mr. Lavaris, I take it, had pretty much confessed to this murder; is that correct?

A Yes; to me. Officer Crawford wasn't present.

The detective further testified:

Q [By the prosecutor] Was it your intent to question the defendant [Lavaris] before he was advised of his constitutional rights?

A No, not before.

Q You mean in the jail, that's what you were speaking of, right before he waived his constitutional rights; apparently he made statements to you admitting certain facts about the incident, is that correct?

A That's correct.

Q Were those statements made in response to questions you had asked him about the crime?

A Initially they were not, not initially. His initial statement was that, yes, he did it and he didn't want to get anyone else in trouble for it. I asked him if he was aware of the prior trial of Mr. Castro and we discussed the newspaper clipping, and he said that he had seen it in the newspaper; and from that conversation he offered that Castro was not involved in it and he seemed very concerned that Castro got in trouble for something that he did. It was more that type of a conversation rather than a confession, and we really didn't get into the details and going over what happened until [the interpreter] arrived.

The details of the conversation were not developed, apparently neither counsel believing them to be important. Lavaris did not testify at the suppression hearing, although he could do so without jeopardizing his right to remain silent at the trial. CrR 3.5(b). From a view of the record most favorable to the defense, the strongest case that can be made out is that on the initial contact, Lavaris stated that he was the one who had committed the murder, not Castro, and that he did not want Castro to be in trouble for

it. Thereafter, one of the detectives discussed the murder with him asking several questions, specific content unknown, which Lavaris answered presumably with incriminating statements.

Upon arrival of the interpreter, there was a meticulous respect for Lavaris' rights and sensibilities and the same was true 4 days later when he approved the written confession. There is not a breath of evidence that the conversation before the formal interrogation in any way changed Lavaris' attitude from his initial declaration that he had committed the murder. Nor is there the slightest hint of police overreaching in this record, it being evident that Lavaris cooperated with the police in describing the crime because he wanted to, not because he was somehow induced or tricked into telling about it. Lavaris gave a consistent account; there is nothing to suggest that he confessed after being told of his rights because "the cat was out of the bag."

Under these circumstances, the 3 o'clock confession was made voluntarily. As said in *United States v. Toral*:

> [W]hen the circumstances surrounding a prior involuntary confession carry over to make a knowing and voluntary waiver impossible, a confession is inadmissible even if the accused is advised of his rights beforehand. . . . This rule is not inflexible, however. Even though a prior involuntary confession irretrievably "lets the cat out of the bag," a subsequent confession may still be made voluntarily under the proper circumstances.

(Citations omitted.) *Toral,* at 896.

■ The next issue concerns the trial court's refusal to strike, from a written statement given by Betty Haro, a reference to a polygraph test, and the court's refusal to declare a mistrial when the prosecutor stated in examining Detective Crawford that it was in evidence "Haro volunteered to take a test." Lavaris claims the references to a polygraph test require reversal because they raise the inference that Haro would have passed such a test if she had taken one. A reference to a polygraph test is not reversible

error unless an inference is raised about the results of the test that is prejudicial to the defendant. *State v. Descoteaux*, 94 Wn.2d 31, 614 P.2d 179 (1980). There were no inferences raised by the isolated references to a polygraph test that were prejudicial to Lavaris because the jury was informed that no test was conducted. *See State v. Agren*, 28 Wn. App. 1, 7–8, 622 P.2d 388 (1980). The trial court was correct in refusing to strike the statement and in denying the motion for a mistrial.

The third issue concerns Haro's testifying about certain statements made by Castro concerning the incident. Lavaris claims that testimony was inadmissible hearsay, finding particularly objectionable Castro's purported statement: "If anything happens, don't ever mention that I been here."

ER 801(c) defines hearsay as

a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

None of the purported statements by Castro (the declarant), that Haro testified about, were offered "to prove the truth of the matter asserted." Thus, the statements were not hearsay and the trial court was correct in admitting them.

The judgment is affirmed.

CORBETT, J., concurs.

RINGOLD, J. (dissenting)—The majority fails to assign adequate weight to the effect that Lavaris' inadmissible confession, taken by a police officer in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), had on Lavaris' ability to intelligently waive his rights and make a voluntary confession after having already "let the cat out of the bag." *State v. Erho*, 77 Wn.2d 553, 463 P.2d 779 (1970). Instead, the majority disregards the trial court's finding that Lavaris' first confession was illegal, and even uses the first confession as the principal reason for ruling the second confession

admissible. I would hold, following *Erho,* that the second confession was tainted with the illegality of the first, and there were no intervening circumstances sufficient to remove that taint. I accordingly dissent.

A fuller understanding of the facts is necessary for a proper analysis of the issue. On February 19, 1981, at about 2 p.m., Detectives Gruber and Crawford went to the King County Jail to speak with Lavaris about his involvement in the murder.[2] While Crawford retrieved his gun from the gun locker, Gruber asked Lavaris if he spoke English; Lavaris replied that he did. Gruber informed Lavaris of the trial and conviction of his codefendant Castro and asked him if he would come across the street to the detectives' office and talk to them. Lavaris indicated that he would come and talk to them because he did not want someone else to get in trouble for something he had done.

Gruber arranged for a Spanish–speaking officer to meet them at the office to advise Lavaris of his rights and act as an interpreter. When asked why he did this even though Lavaris spoke English, Gruber testified that problems had arisen several months earlier with a Filipino defendant who had not been admonished of his rights in Tagalog. When asked why he did not advise Lavaris of his rights in English at the jail, Gruber stated that even though he felt Lavaris would have understood the rights in English, "I don't generally do that. I generally wait until we get over to the office

---

[2]The majority opinion seems to imply that the trial court was wrong in holding that the pre-*Miranda* statements resulted from custodial interrogation and were therefore inadmissible. The record here demonstrates that Lavaris, even if not actually questioned, was subjected to the functional equivalent of interrogation. The Supreme Court stated the rule in *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

(Footnotes omitted.)

or until the interview begins."

In the elevator, when Lavaris began to speak, Crawford interrupted him and told him to wait until they got to the office, so that he could be advised of his rights. When Lavaris and the detectives arrived across the street for the questioning, however, the interpreter had not yet arrived. Detective Crawford left to locate the interpreter, and Gruber and Lavaris sat and talked for 45 minutes until Crawford returned with the interpreter. During that time, according to Gruber:

A We had gone over the personal information form . . . We discussed all of that and we also did discuss the incident; things came up and he spoke about them and we did discuss them.

Q And you asked him some questions about the incident, did you not?

A Yes.

Q And of course, in your mind at that time it was crystal clear that he could speak and understand English.

A I felt that he understood, yes.

. . .

Q Was there any reason that you could not have waited for [the interpreter] to come over before you started questioning him about the incident?

A Well, you would have to understand the tone of the whole meeting. Mr. Lavaris was very eager to talk about the incident.

. . .

Q Before [the interpreter] had a chance to advise Mr. Lavaris of his rights, Mr. Lavaris, I take it, had pretty much confessed to this murder; is that correct?

A Yes; to me. Officer Crawford wasn't present.

After the interpreter arrived, Lavaris was advised of his rights, in Spanish and English, and was interrogated by both detectives, resulting in a 3–page typewritten statement confessing to the crime.

At the CrR 3.5 hearing, the trial court found that the statements made before Lavaris was advised of his rights were the result of custodial interrogation and that the State had not carried its burden of showing that the statements were voluntary. Although it ruled the preadvisement state-

ments inadmissible, the court went on to conclude that the postadvisement statements were made freely and voluntarily after advice of rights and hence were admissible.

Where a defendant has already confessed to a crime, even though such confession may not be admissible in evidence against him, special care must be taken to make sure that any subsequent statements are in fact made freely and voluntarily, and did not result from the earlier confession having "let the cat out of the bag." The defendant must be "free of the psychological and practical disadvantages of having confessed.'" *See State v. Erho, supra* at 561, quoting *United States v. Bayer,* 331 U.S. 532, 540, 91 L. Ed. 1654, 67 S. Ct. 1394 (1947). In *Erho,* as in the instant case, an oral confession was made which the trial court found to be inadmissible. It was immediately followed by another statement ruled admissible by the trial court. The court held that the fact that the police had recited *Miranda* warnings during the time between the two statements did not render the later admission voluntary:

> it is conceivable that circumstances could be shown which would elevate [advice and acknowledgment of *Miranda* rights] to the dignity of a voluntary, intelligent, and knowing waiver of constitutional rights, even after improper preliminary interrogation. However, no such circumstances appear in the record here, and absent such a showing the introductory pronouncements, standing by themselves, are insufficient. *Miranda v. Arizona, supra.*

*Erho,* at 561.

The majority finds the second confession admissible based on three factors which it holds sufficient as the "circumstances" required by the court in *Erho*: (a) the "meticulous respect for Lavaris' rights and sensibilities" shown by the police *after* the questioning which resulted in the unlawful confession; (b) the lack of "a breath of evidence that the conversation before the formal interrogation in any way changed Lavaris' attitude from his initial declaration that he had committed the murder"; and (c) the lack of evidence that Lavaris made his formal statement "because

'the cat was out of the bag.'"

These reasons cannot make Lavaris' confession free and voluntary or his waiver of rights knowing and intelligent. The first factor was present in *Erho* and rejected by the court. In *every* case involving pre-*Miranda* and post-*Miranda* confessions it is obvious that the defendant was given his rights before the latter confession was made. The issue is whether there are sufficient *additional* factors which, together with the advice of rights, erase the taint of the first confession. *State v. Erho, supra.*

Neither can the majority's second and third reasons purge Lavaris' confession of the taint. The majority erroneously places on Lavaris the burden of showing that the second confession was involuntary and that the second confession resulted from the first. On the contrary, the State bears the burden of establishing the voluntariness of a confession and the waiver of rights necessary to make a confession admissible in evidence. *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973); *State v. Gross,* 23 Wn. App. 319, 597 P.2d 894 (1979). In the context of this case, the State had the burden of showing that the post-*Miranda* confession was sufficiently attenuated and insulated from the pre-*Miranda* confession to render it free and voluntary. This court must make an independent review of the record to determine whether the subsequent confession was free of the initial taint. *State v. Roth,* 30 Wn. App. 740, 637 P.2d 1013 (1981). After having reviewed the record, I conclude that the State has failed to make the required showing.

A defendant who without advice of his rights has given an incriminating statement in response to custodial interrogation is under great psychological disadvantage with respect to the voluntariness of subsequent statements, having already "let the cat out of the bag" in an inadmissible statement. *State v. Erho, supra.* As a practical matter, *Miranda* warnings are of little use to a person who has already confessed. A person in this position is likely to think "'"[w]hat use is a lawyer? What good is a lawyer

now? What benefit can a lawyer tell me? I've already told the police everything?"'" *People v. Raddatz,* 91 Ill. App. 2d 425, 430, 235 N.E.2d 353, 356 (1968).

For *Miranda* warnings to insulate a second confession, it must be "amply removed from the preceding statement in time or circumstances to 'sufficiently distinguish' it from the unlawful oral confession." *Randall v. Estelle,* 492 F.2d 118, 120 (5th Cir. 1974). In *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) and *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), the United States Supreme Court pointed to three relevant factors that should be considered in determining whether a confession has been purged of the taint: (1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. In the recent case of *Taylor v. Alabama,* ___ U.S. ___, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982), the Supreme Court held that the defendant's confession should have been suppressed as the fruit of an illegal arrest even though there was a 6–hour interval between the time of his arrest and the taking of the confession. The Court in *Taylor* held that neither the 6–hour gap between the illegal arrest and the advice of rights, nor the booking procedures themselves, nor an intervening conference between the defendant and his girlfriend, were sufficient to neutralize the taint.

The record here does not support a finding either that Lavaris intelligently waived his rights or that the second confession was free and voluntary. *State v. Erho, supra.* The defendant's statements were the product of custodial interrogation, not spontaneous voluntary admissions. As the trial court found, the express purpose of Detectives Crawford and Gruber in going to the jail to see the defendant "was to take statements." The record is clear that there was no break in either time or physical surroundings between the pre–*Miranda* and post–*Miranda* statements. The detectives never told Lavaris that the statements he made prior to advice of rights would be inadmissible in

court. The only interruption to the confession, once begun, was a recital of *Miranda* warnings, in both English and Spanish, to Lavaris. There were no other intervening circumstances to break the causal connection, such as a conference with a lawyer or with others. Under *State v. Erho, supra,* the confession should have been excluded.

I would reverse and remand for a new trial.

Reconsideration denied September 15, 1982.

Review granted by Supreme Court January 20, 1983.