[No. 49094-5.   En Banc.   June 16, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. LUIS M. LAVARIS, *Petitioner*.

David R. Wohl of Washington Appellate Defender Association, for petitioner.

Norm Maleng, Prosecuting Attorney, and Margaret Doyle Fitzpatrick and Jeff Baird, Deputies, for respondent.

STAFFORD, J.—Petitioner, Luis Lavaris, challenges a Court of Appeals decision which upheld the admissibility of a confession which he made shortly after receiving the required *Miranda* warnings. He asserts that inculpatory statements made immediately prior to the warnings rendered the subsequent confession inadmissible. We hold that once a criminal defendant has let the "cat out of the bag", the subsequent giving of *Miranda* warnings alone will not erase the taint inherently associated with the pre–*Miranda*

confession. Absent some kind of insulating factor to separate the two confessions, the second confession is as inadmissible as the first. We reverse the Court of Appeals and remand for a new trial.

On the morning of July 9, 1980, the body of Jesus Perez was found in the broom closet of a downtown Seattle apartment building. The victim had been stabbed numerous times. Later that day, police found a large amount of blood in the apartment of Betty Haro, who lived just down the hall from the closet. Haro initially denied knowing the victim or having any knowledge of the murder. Ten days later, however, she retracted her first statement and told police that petitioner, known to her as "Lupe", Francisco Castro and the victim had spent the night of July 8 in her apartment. Haro told the police that during the evening petitioner had repeatedly told her that Perez was "no good". Haro further recalled seeing Castro and petitioner in possession of a butcher knife with a 6– to 7–inch blade. Upon seeing the knife, Haro told them she did not want any trouble in her apartment. She then went to sleep, as did the victim, Perez. When she awoke, she saw Castro and petitioner standing over the victim's body, removing money from his pockets. She neither saw the actual murder nor did she see either Castro or petitioner with a knife in his possession at that time. She later identified petitioner from a photograph as the man known to her as "Lupe".

At the close of her tape–recorded conversation with the police, Haro stated: "That's the truth, I . . . I'll take one of those tests if you want me to." The entire taped conversation was admitted at trial. Petitioner objected to the mention of the proposed polygraph test even though no polygraph test had been taken. Haro's testimony at trial was consistent with her second statement to the police.

Castro and petitioner were both charged with first degree murder. Castro was tried and convicted in October 1980. In December 1980, petitioner was arrested in Oregon, extradited to Washington and placed in the King County Jail to await trial on the first degree murder charge.

On February 19, 1981, at about 2 p.m., Detectives Gruber and Crawford of the Seattle Police Department met with petitioner in the lobby of the King County Jail. Detective Gruber explained to petitioner that they wished to talk with him about the Perez murder and that if he agreed, they would take him across the street to their office where they could all be "more comfortable". Petitioner thereupon indicated he was willing to talk with the officers because he "didn't want somebody else getting in trouble for something he did". Before taking petitioner across the street, the detectives requested that a bilingual officer meet them in the interview room so petitioner could be advised in both Spanish and English of his rights under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). This request was made even though the detectives had already determined petitioner could speak and understand English.

Detective Gruber waited with petitioner in the interview room for approximately 45 minutes while Detective Crawford attempted to locate the interpreter. At no time during this period was petitioner given his *Miranda* warnings. An account of what transpired during the 45-minute period was disclosed in the testimony of Detective Gruber as follows:

A. We had gone over the personal information form . . . We discussed all of that and we also did discuss the incident; things came up and he spoke about them and we did discuss them.

Q. [By defense counsel] And you asked him some questions about the incident, did you not?

A. Yes.

Q. And of course, in your mind, at that time it was crystal clear that he could speak and understand English.

A. I felt that he understood, yes.

. . .

Q. Was there any reason that you could not have waited for [the interpreter] to come over before you started questioning [Lavaris] about the incident?

A. Well, you would have to understand the tone of the whole meeting. Mr. Lavaris was very eager to talk

about the incident.

Q. And you were very eager to question him, were you not?

A. Mr. Lavaris did way more talking than I did questioning.

Q. Was there any reason why you could not have waited until [the interpreter] came over at three o'clock before you started taking down a statement in a case of that serious nature?

A. I didn't take any notes at all during that . . . conversation. It was strictly sitting there and basically talking.

Q. My question, Officer, was whether or not you could have waited for [the interpreter]. That would not have posed any hardship to you.

A. No, it wouldn't have.

Q. Now, did Mr. Lavaris indicate to you a time or two that he didn't want to talk to you any more?

A. No.

Q. He never indicated that to you?

A. No.

Q. Before [the interpreter] had a chance to advise Mr. Lavaris of his rights, Mr. Lavaris, I take it, had pretty much confessed to this murder; is that correct?

A. Yes; to me. Officer Crawford wasn't present.

Q. [By the prosecutor] Was it your intent to question the defendant [Lavaris] before he was advised of his constitutional rights?

A. No, not before.

. . .

Q. You mean in the jail, that's what you were speaking of, right before he waived his constitutional rights apparently he made statements to you admitting certain facts about the incident, is that correct?

A. That's correct.

Q. Were those statements made in response to questions you had asked him about the crime?

A. Initially they were not, not initially. His initial statement was that, yes, he did it and he didn't want to get anyone else in trouble for it. I asked him if he was aware of the prior trial of Mr. Castro and we discussed the newspaper clipping, and he said that he had seen it in the newspaper; and from that conversation he offered that Castro was not involved in it

and he seemed very concerned that Castro got in trouble for something that he did. It was more that type of a conversation rather than a confession, and we really didn't get into the detail and going over what happened until [the interpreter] arrived.

CrR 3.5 hearing, Report of Proceedings, at 20–23.

The interpreter finally arrived about 3 p.m. Petitioner was then informed of his *Miranda* rights in both Spanish and English and indicated he understood them. Thereafter, in response to interrogation by the detectives, petitioner gave a detailed account of his participation in the murder. Most of the questions, as well as petitioner's answers thereto, were given solely in English. His oral confession was reduced to a 3–page typewritten statement which petitioner acknowledged as correct 4 days later. He did not sign the statement, however, because he could not read or write.

At the CrR 3.5 pretrial suppression hearing the trial court found the State had failed to prove that Lavaris' pre–*Miranda* statements were spontaneously made and therefore suppressed them as the product of a custodial interrogation. The trial court, however, admitted all statements made by petitioner after he had been informed of his *Miranda* rights.

The jury convicted petitioner of first degree murder. The Court of Appeals affirmed. *State v. Lavaris,* 32 Wn. App. 769, 649 P.2d 849 (1982). The majority found the post–*Miranda* confession was made voluntarily without any of the conditions that rendered the first confession inadmissible. Judge Ringold disagreed, however, arguing that the recitation of *Miranda* rights, without additional insulating factors, was not enough to erase the taint of the first confession. We agree.

I

The United States Supreme Court has declared that a state may not use statements made by a criminal defendant while in custodial interrogation unless that defendant has first been apprised of his constitutional right to counsel and of his privilege against self–incrimination. *Miranda v. Ari-*

*zona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). While *Miranda* was aimed at deterring coercive police conduct, its message is clear. Any form of custodial interrogation is inherently coercive. *Miranda,* at 457. *See also* Sonesheim, *Miranda and the Burger Court: Trends and Countertrends,* 13 Loy. U. Chi. L.J. 405, 423 (1982). Therefore, any confession obtained in the absence of proper *Miranda* warnings is by definition "coerced"—regardless of how "friendly" the actual interrogation. The question before us is whether the giving of subsequent *Miranda* warnings will purge the taint necessarily associated with petitioner's initial pre–*Miranda* confession.

In the CrR 3.5 suppression hearing, the trial court concluded the statements made by petitioner prior to 3 p.m. were the product of a custodial interrogation and hence inadmissible under *Miranda* and its progeny. The State does not challenge this conclusion. The trial court further ruled that the subsequent advisement of *Miranda* rights removed the constitutional infirmity from any post–*Miranda* statements. Petitioner correctly contends this ruling is contrary to both federal and state law.

█ The Supreme Court held in a case consolidated with *Miranda* (*Westover v. United States*) that the absence of proper *Miranda* warnings prior to the first confession does not necessarily invalidate subsequent post–*Miranda* statements. *Miranda,* at 494. The post–*Miranda* statements in *Westover* were nevertheless found inadmissible because they were not removed "in time and place" from the original surroundings. In *Westover,* the FBI interrogation, which was accompanied by the proper *Miranda* warnings, was conducted immediately following a local police interrogation "in which no *Miranda* warnings had been given". As the Supreme Court observed, the post–*Miranda* statements were made "in the same compelling circumstances". Accordingly, since there was no break in the causative chain between the pre–*Miranda* and post–*Miranda* confessions, the second confession suffered from the same infirmity as

the first. *Cf. Taylor v. Alabama,* 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982); *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (admissibility of confession given subsequent to unlawful arrest depends on connection between illegal police conduct and confession). *See also People v. Braeseke,* 25 Cal. 3d 691, 705, 602 P.2d 384, 159 Cal. Rptr. 684 (1979) (post–*Miranda* confession presumed just as involuntary as the earlier one absent a showing of some break in causative connection between the two).

Implicit in *Westover* is the suggestion that a reviewing court must look to some kind of "insulating factor" which separates the pre–*Miranda* confession from any subsequent statements. As in *Westover,* petitioner's post–*Miranda* statements followed immediately after the first confession. Moreover, the custodial setting did not change nor did petitioner consult with an attorney following the recitation of his *Miranda* rights.

Under the proper circumstances certain insulating factors may break the causative chain. The most critical factor is a showing that the defendant knew earlier statements made prior to the *Miranda* warnings could not be used against him. Petitioner was never informed of this important factor, therefore, his post–*Miranda* confession must be suppressed as the direct product of the first invalid confession.

This conclusion is further mandated by our previous decision in *State v. Erho,* 77 Wn.2d 553, 463 P.2d 779 (1970). In *Erho,* this court was asked to determine the admissibility of a post–*Miranda* confession given immediately subsequent to an invalid oral confession which had been tainted by inadequate *Miranda* warnings. In finding the subsequent written statement inadmissible, this court stated at page 561:

> We are satisfied, upon the record as it stands, that the written statement is but the direct and derivative product of the oral admissions. It perforce suffers from the same infirmities the trial court found infected the

oral statements. In short, by his oral admissions the appellant had "let the cat out of the bag by confessing" and was not "thereafter free of the psychological and practical disadvantages of having confessed." He could not get the cat back in the bag, for the secret was out. *United States v. Bayer,* 331 U.S. 532, 91 L. Ed. 1654, 67 S. Ct. 1394 (1947); *Westover v. United States,* 384 U.S. 436, 494, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *Harrison v. United States,* 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968). Thus, the voluntariness and admissibility of his written statement was compromised.

Contrary to respondent's assertion, we find *Erho* applicable here.

First announced in *United States v. Bayer,* 331 U.S. 532, 91 L. Ed. 1654, 67 S. Ct. 1394 (1947), several courts have adopted the "cat–out–of–the–bag" doctrine. *See, e.g., United States v. Nash,* 563 F.2d 1166 (5th Cir. 1977); *Randall v. Estelle,* 492 F.2d 118 (5th Cir. 1974). The underlying reasons were clearly stated by Justice Harlan in *Darwin v. Connecticut,* 391 U.S. 346, 350–51, 20 L. Ed. 2d 630, 88 S. Ct. 1488 (1968) (Harlan, J., concurring):

> A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition. If a first confession is not shown to be voluntary, I do not think a later confession that is merely a direct product of the earlier one should be held to be voluntary. It would be neither conducive to good police work, nor fair to a suspect, to allow the erroneous impression that he has nothing to lose to play the major role in a defendant's decision to speak a second or third time.

Thus, having already "let the cat out of the bag", a subsequent *Miranda* warning has little significance. As Judge Ringold noted in his dissent in *State v. Lavaris,* 32 Wn. App. 769, 779–80, 649 P.2d 849 (1982):

> As a practical matter, *Miranda* warnings are of little use to a person who has already confessed. A person in this position is likely to think ""[w]hat use is a lawyer? What good is a lawyer now? What benefit can a lawyer tell me? I've already told the police everything?""

We agree.

The State suggests that because petitioner spoke to police of his own free will, his confession rises to the level of a knowing, intelligent and voluntary waiver of constitutional rights. This argument is inherently flawed. As noted above, petitioner was never told that his pre–*Miranda* statements could not be used against him. If anyone should have been informed of this crucial right, it was this defendant. Petitioner could not read or write; English was not his native language. Unless he understood that the giving of *Miranda* rights meant that any prior incriminating statements could not be used against him, petitioner's subsequent confession could not have been voluntary. Having let the "cat out of the bag", the psychological damage was done; the subsequent *Miranda* warnings could not undo that damage. Since the State showed no insulating factor to separate the post–*Miranda* confession from the pre–*Miranda* confession, both confessions are inadmissible. We emphasize that in all such cases as this, the State bears the burden of overcoming the presumption of inadmissibility.

## II

Because of our disposition of petitioner's first assignment of error, we need not reach his second contention regarding the inadmissibility of the polygraph reference. We nevertheless take this opportunity to briefly address the issue.

Citing *State v. Descoteaux,* 94 Wn.2d 31, 38, 614 P.2d 179 (1980), petitioner implies that any reference to a polygraph test is presumed prejudicial unless proved otherwise by the State. *See also State v. Sutherland,* 94 Wn.2d 527, 617 P.2d 1010 (1980). Although in *Descoteaux* we found that an inference regarding the defendant's scheduled polygraph test was error, the error was not prejudicial. "The mere fact a jury is apprised of a lie detector test is not necessarily prejudicial if no inference as to the result is raised". *Descoteaux,* at 38.

While technically not reversible error, however, it would appear the better practice would have been to eliminate the

reference in light of the inherent difficulties associated with *any* kind of reference to a polygraph test. *See State v. Young,* 89 Wn.2d 613, 574 P.2d 1171, *cert. denied,* 439 U.S. 870 (1978); *State v. Pleasant,* 21 Wn. App. 177, 583 P.2d 680 (1978), *review denied,* 91 Wn.2d 1011, *cert. denied,* 441 U.S. 935 (1979). *See also State v. Descoteaux, supra* at 38. The obvious inference to be drawn from Haro's statement is that she was telling the truth. Given her past prevarication, her offer to take a polygraph test could easily carry more weight with the jury. Thus, the failure to excise this reference was error, although not prejudicial under the circumstances of this case.

The Court of Appeals is reversed and the cause remanded for a new trial consistent with this opinion.

WILLIAMS, C.J., and ROSELLINI, UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.