

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 70444-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| MOHAMED M. OSMAN, | UNPUBLISHED OPINION |
| Appellant. | FILED: September 15, 2014 |

LEACH, J. — Mohamed Osman appeals his conviction for two counts of felony stalking under RCW 9A.46.110 and violation of a no-contact order. He claims that the trial court commented on the evidence in a limiting instruction to the jury. He further claims that the trial court violated his Fifth Amendment right against self-incrimination when it admitted his statements about his identity in response to custodial police questioning before he received Miranda[1] warnings. Because the trial court did not make an unconstitutional comment on the evidence and the officers' questions fall within the routine booking exception to Miranda, we affirm.

## BACKGROUND

Osman and Khadro Jama were born in Somalia and met in Maine. In 2005, they married in a religious ceremony recognized by their community but not the state of Maine. They have two children, born 2007 and 2008. Jama obtained a religious divorce from Osman in 2008 and moved with the parties' children to Washington. After Osman traveled to Washington in 2010, a series of domestic violence incidents occurred over the next ten

---

[1] Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

months. These resulted in Osman's conviction of criminal trespass and court orders prohibiting Osman from contacting Jama.

On May 12, 2011, Osman came to Jama's work. After work that day, Jama picked the children up at day care, went home, and found Osman in the parking lot. She told him to leave and threatened to call the police. She testified that he responded, "[G]o ahead, I have nothing to lose; and this is the last time that you call the police, I'm going to kill you." Jama called 911 for help. Osman testified he had no contact with Jama that day.

On October 18, 2011, Osman came to Jama's workplace and remained there until she left work. When she arrived at her children's day care that evening, Osman was there. He followed her car on foot until she called the day-care provider and the provider's husband yelled at Osman. He ran away. Jama drove to her father's house and checked text messages from Osman, received while she was driving. They indicated that Osman knew where her father lived and intended to break into her car. When Jama saw Osman at her father's house, she called the police. Jama testified that she received calls and texts from Osman the entire day. The officer who responded to her 911 call took photographs of the text messages, admitted at trial. Osman was arrested for violation of a no-contact order and remained incarcerated for this and another charge until July 3, 2012.

On July 8, 2012, Osman began a series of calls and texts to Jama. Throughout July, Osman contacted Jama. He called her and told her that he knew her address, which Jama had tried to keep secret from him. On July 19, 2012, Osman called Jama, indicated

that he knew where she was, and threatened the man she was with, her brother. Osman followed Jama to a store with a woman, and the woman approached Jama and referenced Jama's cooperation with the police.

On July 29, 2012, Osman called Jama from a Safeway phone one block from her father's apartment. He told Jama, "[Y]ou have no idea what I'm capable of." Jama testified that she then called 911 because she was afraid. A responding officer described her as seeming scared. She showed officers texts that included messages referencing her children and asking her to meet him. One message referred to sneaky women, and another said that in a Muslim country she would be stoned for disobeying her husband. Another referenced the point of no return, which she testified meant that if she continued working with the police, she would be killed.

On the same date, Jama called 911 for the second time to report that Osman followed her around the Kent Library parking lot after she arrived, calling and texting her. Jama told the 911 dispatcher that Osman was at the library and described him. Several officers entered the library to look for him. Officer Rogers and Officer Ross saw a man who matched Jama's description except that he was wearing a white shirt instead of the black one she had described. Officer Quinonez responded to their request for a better description and left the library to obtain additional details from Jama. She told Quinonez that Osman had a clean-shaven head, a chipped tooth, and a small scar above his right eye.

Rogers and Ross approached the man who almost met the clothing description and realized that he also had a shaved head. They asked him for identification. The man

told them that he did not have any. Rogers asked him if he was Mohamed Osman, and the man responded, "[N]o." They spoke with the man and realized that he did have a chipped tooth and a scar above his eye. They asked him his name and if he had ever had identification in any state. The man responded that he had an identification card from Arizona but gave a name and date of birth that did not match any record in Washington or Arizona. During this time, Rogers did not consider the man free to leave. Rogers and Ross did not read the man his Miranda rights before he was questioned about his identity, and Jama had not identified him. Rogers and Ross then escorted the man to the front of the library, and Jama identified the man as Osman. Osman was arrested and read his Miranda rights. Officer Quinonez transported him to jail.

The State charged Osman with two counts of felony stalking, felony harassment, and domestic violence misdemeanor violation of a court order. For the counts of felony stalking, the State alleged an aggravating factor of domestic violence.

The trial court held a CrR 3.5 hearing to determine admissibility of the statements Osman made to Rogers and Ross inside the library. The trial court found that Rogers and Ross asked Osman for identification to confirm his identity and not to elicit incriminating information. The court ruled that because Osman "could not go anywhere" and was in a "controlled environment," Osman's statements were "custodial." But the court did not find the officers' questions to Osman about his identity to be "interrogation'" and therefore concluded that the statements were admissible despite the absence of Miranda warnings.

At trial, the court admitted evidence of actions that occurred between March 2010 and January 2011 under ER 404(b), before the dates of the charged offenses. Osman requested the following limiting instruction:

> Certain evidence has been admitted in this case for only a limited purpose. Evidence of the March 15, 2010 incident may be considered by you only for the purpose of weighing: whether Ms. Jama had reasonable fear for purposes of the stalking and harassment charges and Mr. Osman's intent required for the stalking charges. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

The trial court refused to give Osman's proposed instruction and gave instruction 6:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of prior instances of alleged misconduct by the defendant between March 2010 through January 2011 and may be considered by you only for the purposes of evaluating the reasonable fear of the complainant, the delay in reporting of the complainant, and the intent of the defendant.
>
> In addition, other evidence has been admitted in this case for only a limited purpose. This evidence consists of a conviction of a court-order violation and a conviction for criminal trespass in the first degree. This evidence may be considered by you only for the purpose of determining whether the State has proved element (5)(a) of Instructions 19 and 20 involving the two counts of stalking.
>
> Any discussion of the evidence during your deliberations must be consistent with those limitations above.

The jury found Osman guilty of counts I and II of felony stalking as well as the domestic violence misdemeanor violation of a court order. They found him not guilty of felony harassment and could not reach a verdict on the lesser offense of misdemeanor harassment. On the counts of felony stalking, the jury concluded that the State did not prove an aggravating factor of domestic violence.

Osman has appealed and the State has cross appealed, challenging certain findings made by the trial court after the CrR 3.5 hearing.

## STANDARD OF REVIEW

This court reviews jury instructions de novo.[2] Because article IV, section 16 of the Washington Constitution prohibits judicial comment on evidence, a challenge to a jury instruction as a comment may raise a manifest constitutional error that can be asserted for the first time on appeal.[3] We presume judicial comments are prejudicial, and the State has the burden of proving that any error was harmless unless the record affirmatively shows that no prejudice could have resulted.[4]

To determine if police engaged in "interrogation" for Miranda purposes, we defer to the trial court's findings of fact but review its legal conclusions from those findings de novo.[5] If we find error, the State bears the burden of showing that the error was harmless beyond a reasonable doubt.[6]

## ANALYSIS

For the first time on appeal, Osman claims that the trial court's instruction limiting the jury's use of ER 404(b) evidence commented on the evidence, which the Washington Constitution prohibits. Generally, a failure to present an issue in the trial court waives the

---

[2] State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (citing State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995)).

[3] Levy, 156 Wn.2d at 719-20.

[4] Levy, 156 Wn.2d at 723 (citing State v. Lane, 125 Wn.2d 825, 838-39, 889 P.2d 929 (1995)).

[5] In re Pers. Restraint of Cross, ___ Wn.2d ___, 327 P.3d 660, 673 (2014) (citing United States v. Poole, 794 F.2d 462, 465 (9th Cir. 1986)).

[6] Cross, 327 P.3d at 673 (citing State v. Easter, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996)).

right to raise the issue on appeal.[7] However, RAP 2.5(a)(3) allows a party to raise for the first time on appeal a "manifest error affecting a constitutional right." As used in RAP 2.5(a)(3), "manifest" "means that a showing of actual prejudice is made."[8] A court previews the merits of the constitutional argument first raised on appeal to determine if it is likely to succeed.[9]

Article IV, section 16 of the Washington Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This constitutional prohibition prevents "'the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted.'"[10] A judge may not convey to a jury his or her personal attitudes about the merits of the case or instruct the jury that factual matters have been established as a matter of law.[11] A court can violate the constitutional prohibition without expressly conveying its personal feelings about evidence; it is sufficient if they are merely implied to the jury.[12] Courts strictly apply the constitutional prohibition against judicial comment on the evidence.[13]

Osman argues that jury instruction 6 communicated to the jury the judge's view that the evidence proved two elements of felony stalking: (1) Jama feared injury to

---

[7] RAP 2.5(a).

[8] State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001).

[9] Walsh, 143 Wn.2d at 8.

[10] State v. Lampshire, 74 Wn.2d 888, 891-92, 447 P.2d 727 (1968) (quoting Heitfeld v. Benevolent & Protective Order of Keglers, 36 Wn.2d 685, 699, 220 P.2d 655 (1950)).

[11] Levy, 156 Wn.2d at 721 (citing State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).

[12] Levy, 156 Wn.2d at 721.

[13] City of Seattle v. Arensmeyer, 6 Wn. App. 116, 120, 491 P.2d 1305 (1971).

herself, and (2) this fear was reasonable. He identifies as the prohibited comment expressing this view the underlined words of this phrase from instruction 6, "may be considered by you only for the purposes of evaluating <u>the reasonable fear of the complainant</u>, the delay in reporting of the complainant, and the intent of the defendant." Osman asserts that the court's "phrasing communicated to the jury an assumption that reasonable fear existed and needed only to be evaluated."

The State responds that when viewed as a whole and in context, instruction 6's reference to "evaluating the reasonable fear of the complainant" did not suggest that the evidence proved an element of felony stalking. We agree.

As noted by the State, abstract "reasonable fear" is not an element of stalking. Instead, the court's instructions required that the State prove "Khadro Jama reasonably feared that the defendant intended to injure her." Instruction 6 did not suggest what, if anything, the court believed Jama feared or the reasonableness of that fear. Fairly read in context, instruction 6 does not imply any judicial belief about any fear experienced by Jama.

Osman essentially concedes the logic of this analysis in his briefing when discussing instruction 6's reference to "the intent of the defendant." Osman states that this reference does not comment on the evidence

> because the mere existence of "intent" is not an element. The element is the specific intent to frighten, intimidate, or harass. RCW 9A.46.110. Therefore, asking the jury to evaluate Osman's intent merely asks them whether he intended to frighten, intimidate or harass on the one hand, or, on the other hand, whether his intent was to communicate with his children, or further some other legitimate goal. As to intent, the instruction leaves it to the jury to decide whether intent to harass has been established.

Similarly, instruction 6 left to the jury to decide if the State had established that Jama reasonably feared that Osman intended to injure her.

Osman relies upon State v. Becker,[14] where the court held that the trial court had removed from the jury's consideration whether YEP was a school when it asked the jurors in a special verdict form to determine if the defendants were "within 1000 feet of the perimeter of school grounds, to-wit: Youth Employment Education Program School." The court held that by so identifying YEP in the special verdict form, the trial court had instructed the jury that YEP was a school. This amounted to an unconstitutional comment on the evidence.[15]

Osman analogizes instruction 6 to the special verdict form in Becker. However, as the State notes, it could not prove felony stalking by showing that Jama had reasonable fear; it had to prove that she reasonably feared that Osman would injure her. Instruction 6 did not remove from the jury's determination any element of felony stalking. Thus, Osman's analogy to Becker fails.

Even if instruction 6 commented on the evidence, the State affirmatively shows the lack of prejudice to Osman. The State notes that the jury convicted Osman of violating the no-contact order but acquitted him of the corresponding felony harassment charge, showing that the jury could not have been influenced by any judicial comment. Jama testified at trial that Osman had contacted her on May 12, 2011, and threated to kill her. Osman testified, however, that he had not had contact with Jama on that day. In closing

---

[14] 132 Wn.2d 54, 63-64, 935 P.2d 1321 (1997).
[15] Becker, 132 Wn.2d at 64-65.

argument, Osman's defense counsel asserted that Jama did not actually fear that Osman would kill her.

Felony harassment includes the requirement that Osman's words or conduct placed Jama in reasonable fear that the threat to kill would be carried out. The jury's finding that Osman violated the no-contact order shows that they believed Jama's testimony that Osman had contacted her on that day. By acquitting Osman of felony harassment, the jury necessarily reached one of two possible conclusions: the State failed to prove either that the threat to kill had occurred or that Jama reasonably feared that Osman would carry out the alleged threat. This demonstrates that the alleged judicial comment could not have impacted the jury's decision on the pertinent element of felony stalking—whether Jama reasonably feared that Osman would carry out the alleged threat.

Because Osman has failed to establish manifest constitutional error, we decline review of his challenge to instruction 6.

Osman also challenges the trial court's failure to suppress statements he claims the police obtained in violation of his Fifth Amendment right against self-incrimination. Before Osman received Miranda warnings, Officer Rogers asked him at the Kent Library if he was Mohamed Osman, and the trial court admitted over objection Osman's response of "no." The trial court found that Osman's July 29, 2012, statements about his identity were made while in police custody but were not a result of interrogation.

The Fifth Amendment's protection against self-incrimination includes the right to be informed of one's rights before custodial interrogation may take place.[16] Statements obtained in response to custodial interrogation are inadmissible if not preceded by proper warnings.[17] These warnings include the person's "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[18] However, not all custodial statements are a product of interrogation.[19] For a statement to fall within Miranda, it must be made in response to interrogation.[20]

Osman contends that the officers had reason to know that his answer to their question would elicit an incriminating response. The State responds that the questions at issue were not interrogation and that the trial court correctly decided that the questioning fell within the routine booking procedure exception to Miranda.[21]

Application of the routine booking procedure exception to Miranda does not depend upon the nature of the procedure during which the question is asked; it depends upon the nature of the question.[22] A police request for routine information necessary for

---

[16] Miranda, 384 U.S. at 444; State v. Lavaris, 99 Wn.2d 851, 856-57, 664 P.2d 1234 (1983).

[17] Miranda, 384 U.S. at 444; Lavaris, 99 Wn.2d at 856-57.

[18] Miranda, 384 U.S. at 444.

[19] Rhode Island v. Innis, 446 U.S. 291, 299, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

[20] Innis, 446 U.S. at 299.

[21] See State v. Sargent, 111 Wn.2d 641, 651, 762 P.2d 1127 (1988).

[22] Sargent, 111 Wn.2d at 651.

basic identification is not interrogation that necessitates <u>Miranda</u> warnings, even if the information revealed is incriminating.[23]

Officers Rogers and Ross approached Osman in the library after they received a matching description from Jama. They asked Osman for identification and later asked him his name. Osman denied having identification, gave a false name and birth date, and responded "no" when the officers asked if he was Mohamed Osman. The police were not required to give Osman <u>Miranda</u> warnings before asking these questions.

Osman asserts that the questions must be made during a true booking for the exception to apply. Washington has rejected this narrow view, directing a court's focus to the nature of the questions asked instead of the procedure where they were asked.[24]

Citing <u>Hiibel v. Sixth Judicial District Court</u>,[25] Osman asserts that a request for identification can be interrogation likely to elicit incriminating information. The <u>Hiibel</u> Court rejected a challenge to a Nevada state law that required the petitioner to reveal his identity but left for future decision the situation where a police request for a suspect's identity would give the police a "link in the chain of evidence needed to convict the individual of a separate offense."[26] Osman's statements to Rogers and Ross did not provide an important link to Osman's conviction. Rather, Jama's identification of him as her perpetrator provided this link. In <u>Hiibel</u>, the court observes that while one's identity is

---

[23] <u>United States v. McLaughlin</u>, 777 F.2d 388, 391-92 (8th Cir. 1985); <u>State v. Walton</u>, 64 Wn. App. 410, 414, 824 P.2d 533 (1992), <u>abrogated on other grounds by Cross</u>, 327 P.3d at 673 n.8.

[24] <u>Sargent</u>, 111 Wn.2d at 651.

[25] <u>Hiibel v. Sixth Judicial Dist. Court</u>, 542 U.S. 177, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004).

[26] <u>Hiibel</u>, 542 U.S. at 191.

unique, it is also universal and is likely to be "so insignificant in the scheme of things as to be incriminating only in unusual circumstances."[27] From the perspective of Osman, the questions asked by Rogers and Ross about Osman's identity would not have reasonably resulted in an incriminating response.

In view of our disposition of this case, we do not address the State's cross appeal.

## CONCLUSION

Because Osman fails to show that the trial court improperly commented on the evidence and also does not show that the trial court erred by admitting custodial statements under the routine booking exception to Miranda's protections, we affirm.

_Leach, J._

WE CONCUR:

_Cox, J._

_Spearman, J._

---

[27] Hiibel, 542 U.S. at 191.