[No. 48729-4. En Banc. June 7, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. MITCHELL EDWARD RUPE, *Appellant*.

*Clifford F. Cordes III* (of *Cordes, Younglove & Wyckoff*), for appellant.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Gary R. Tabor, Chief Criminal Deputy,* for respondent.

ROSELLINI, J.—This case comes to us for direct review of defendant Mitchell E. Rupe's sentence of death. Defendant was convicted of two counts of aggravated first degree murder and two counts of first degree robbery.

By this appeal, defendant raises multiple issues relating to his conviction and to his sentence. The issues raised by defendant in respect to his conviction are:

1. Did the trial court abuse its discretion by refusing to grant a change of venue?

2. Did the trial judge err in admitting defendant's statements to police?

3. Do technical violations of RCW 9.73.090 require exclusions of defendant's taped statements to police?

4. Was defendant prejudiced by the admission of the 911 tape, predeath photos of the victims or hearsay testi-

mony?

5. Was defendant denied due process by the exclusion of evidence regarding the results of the State's chief witness' polygraph examination?

6. Do separate convictions for robbery, where money is taken from areas under the control of two different individuals, constitute double jeopardy?

7. Does due process require that the State inform the defendant that identified witnesses may have potentially exculpatory evidence when the witnesses' statements have been released to defense counsel?

8. Did the prosecutor improperly exceed the scope of cross examination?

9. Was the jury improperly allowed to consider aggravating factors which were not supported by the evidence?

10. Was defendant denied due process by the procedure of death qualifying the jury?

Defendant's challenges to his death sentence include:

11. Is the capital punishment statute, RCW 10.95, unconstitutional under our state constitution, article 1, section 14, or the eighth and fourteenth amendments to the United States Constitution?

12. Was the defendant prejudiced by the improper admission of aggravating evidence?

13. Did the trial judge improperly exclude mitigating evidence during the defendant's sentencing proceeding?

14. Was the jury improperly instructed during the sentencing phase?

15. Was the defendant prejudiced by the trial judge's decision to allow jurors access to publicity during the period between the guilt phase and the sentencing phase?

In addition to the above issues, RCW 10.95.130 requires that this court independently review defendant's sentence of death.

We resolve these issues as follows:

1. We find that defendant was given a fair trial and was not denied due process or subjected to double jeopardy (issues 1, 5–8).

2. We find that the alleged errors in admission of evidence did not prejudice defendant during the guilt phase of his trial (issues 2–4).

3. We reject defendant's challenge to the death penalty statute.

4. We find the defendant was denied due process of law by the admission of evidence of his gun collection during the sentencing phase.

5. We hold that the jury was properly instructed during the sentencing phase.

We affirm defendant's convictions of two counts of robbery and aggravated first degree murder but remand for a new sentencing proceeding in accordance with this opinion.

Defendant received the sentence of death for shooting and killing two bank tellers during the course of a robbery. The victims, Candace Hemmig and Twila Capron, were employed by Tumwater State Bank to staff its trailer branch in West Olympia. The branch office consisted of a mobile home located in a remote area near the Thurston County Courthouse. On the morning of September 17, 1981, about a half dozen customers transacted business with the bank between approximately 10:25 and 10:45.

At 11 a.m. Michael Capron, Twila's husband, arrived at the bank to take his wife to lunch. He walked into the bank, looked around for his wife and Candy, but couldn't see them. He then heard a rasping sound, approached the counter, and spotted his wife and Candace lying on the floor. Capron attempted to telephone for help by dialing zero, but nothing happened. Another line was lit from an incoming call and Capron punched into that line. Capron testified that he did not remember exactly what he said but believes he said "Help" or "Get help, this is Mike, the bank has been robbed, and Twila has been shot, and I think Candy is dead". Report of Proceedings, at 205. The person on the other line (later identified as Ann Marie Gianoulakis) yelled back "Dial 911" and Capron did so.

When medics and the police arrived on the scene, they determined that Candace was already dead and that Twila

could not survive the apparent massive injuries to her brain.

The police secured the area and began their investigation. Officer Jim Partin was posted outside the bank. At approximately 11:40, Officer Partin was approached by defendant who advised the officer that he had been at the bank that morning.

Within the bank, police officers, gathering evidence, discovered defendant's bloodstained checkbook lying open on the customer's side of the counter.

During the next 5 days, defendant was interviewed several times. On the day of the crime, September 17, defendant talked to police officers once at the scene (approximately 11:40 a.m.), and four times at work (at 2 p.m., 3 p.m., 6 p.m., and 11 p.m.). During these discussions defendant volunteered that he was overdrawn at the bank. He stated that he went to the bank both on the 16th and 17th to take care of the overdraft but was unable to do so because each time he forgot materials needed to resolve the problem. Defendant next was interviewed on the 18th, and on the 20th he went to the police station and prepared an identi–kit sketch of an individual he claimed to have seen at the bank on the 17th.

On September 22, defendant went to the police station to take a polygraph examination. Following the polygraph, Officer Midthun informed defendant that due to the "sensitivity of [his] voice, we have some very serious problems". Polygraph transcript, at 34. After discussing the matter with Officer Midthun, defendant admitted that he had committed the crimes. Defendant subsequently gave three statements to police officers. Searches of his vehicle netted ammunition of the type used in the robbery/murders. In addition, the police found a pair of white pants, wet and soiled, in a vehicle used by defendant the weekend after the murders.

Defendant's trial began with jury selection on March 10, 1982. During voir dire, the judge allowed counsel to question individual jurors, apart from the pool, concerning their

views regarding the death penalty. As no jurors stated that they would be unable to impose the death penalty regardless of the crime, none were excused because of their beliefs concerning the death penalty.

The State's chief witness was Monte Yovetich. Monte, a friend and fellow student of Rupe's at the time of the murders, testified that on Tuesday, September 16, 1981,[1] he accompanied defendant to Olympia. Following a discussion about robbing the Tumwater State Bank, Monte dropped defendant off near it and drove to Olympia Technical Community College (OTCC). Defendant joined him there shortly afterward, and confessed that he had gone into the bank with his gun with the intention of robbing it but was unable to do it. Monte next saw defendant on the 17th between 11 and noon. He testified that defendant told him that he had done it, that he had robbed the bank and put the gun, money and green satchel in Monte's garage.

According to Monte, he and his friend Marlin Townsend looked for the gun and a green satchel and put them in Marlin's car. Monte and Marlin drove toward Grapeview and hid the money and gun. They returned to their respective homes, but shortly thereafter, nervous about the other's honesty, they went to look for each other. When they met up, they retrieved the money and gun. They then dropped the gun off at the home of a third friend, Skip (Carl) Grosskopf. From there they went to dinner and to Marlin's parents' house. While with Marlin's parents, they learned from the newspapers that two women had been shot during the robbery. They retrieved the gun from Skip, took it to the Hartstene Island bridge and threw it into the water. The remaining money was hidden a second time.

Marlin Townsend's testimony generally confirmed this sequence of events. Both Monte and Marlin testified that they took money from the bag. Only slightly over $2,100 of the $4,382 missing from the bank was eventually recovered.

---

[1] In fact, Tuesday was September 15. No one disputed, however, that these events took place on Tuesday of that week, 2 days before the murders.

Skip Grosskopf took the stand and stated that Monte had dropped the gun off around 6 p.m. Skip testified that the gun appeared to have been fired recently but agreed to take it when Monte assured him that it wasn't "hot". An hour and 10 minutes later, Monte returned for the gun. He appeared "nervous, jittery". When asked why he wanted to pick up the gun so soon, Monte stated that he (Skip) "didn't want to know." Report of Proceedings, at 1308.

Defendant's post–polygraph confessions were admitted at trial. In addition, three of defendant's friends testified that defendant admitted involvement in the crimes.[2]

At trial defendant elected to testify and denied robbing the bank. On direct examination by the State, defendant admitted that he had discussed robbing the bank with Monte Yovetich and admitted that he had gone to the bank on September 15, and that he intended to rob it. He stated that he had Monte drop him off near the bank. He carried a green satchel, which contained his gun, a .357 Colt Trooper. Defendant testified that, while in the bank, he decided he couldn't rob it. Consequently, he merely inquired about his account and left.

Monte Yovetich, defendant alleged, subsequently borrowed the .357 Colt Trooper in order to go hunting. Two witnesses, David Schroeder and George Fullerton, testified that defendant had discussed loaning the gun to Monte.

Defendant testified that he returned to the bank on September 16 and 17.

Defendant, employed as a security guard at OTCC, worked a double shift the evening of the 16th, and got off work at 7 a.m. Thursday, the 17th. Between 7 and 10 a.m., he "hung around the school" waiting to get into the dental clinic. About 10 o'clock, defendant decided that he was too tired to go to the clinic and left. He stated that he was wearing white pants and a blue shirt when he left OTCC. Following breakfast at the Hungry Farmer, he went to the

---

[2]These conversations occurred during the weeks following defendant's arrest while he was incarcerated in the Thurston County Jail.

bank. He arrived around 10:30.

Defendant testified that while transacting his own business, he saw a large motorcycle pull into the bank's parking lot. Defendant claims that Monte Yovetich was on the motorcycle, and that attached to the rear of the bike was the green satchel in which he had given Monte his gun 2 days before. Defendant asserts that this frightened him, because he thought Monte was going to rob the bank. He alleges that he then got into his truck and drove away. Both tellers, defendant claimed, were alive when he left the bank.

Defendant testified that he next went to Shelton and paid his storage bill with money that he had in his pocket. The bill was for $280. Defendant paid $300. This sum (and an additional $70) defendant stated was from his paycheck cashed a few days before.

Defendant also tried to explain why he had confessed. Defendant confessed, he stated, because he felt responsible for Monte's act, since Monte used defendant's gun to commit the crime. His testimony ended with a complete denial of any personal involvement in the robberies or murders.

The defense called a psychologist, Dr. Gerald McCarty. Dr. McCarty testified that he had diagnosed defendant as having a schizotypal personality disorder which affected his thought, reasoning and judgment processes. He testified that defendant also had a secondary disorder known as histrionic disorder. Dr. McCarty testified that these personality disorders caused defendant to confess even though he did not actually commit the crimes. Dr. McCarty testified that he did not believe that defendant committed the crimes because his confessions were vague and inconsistent with the physical evidence at the scene.

In rebuttal, the State called two medical witnesses. Both concluded that defendant did not have personality disorders.

The jury was instructed on two counts of first degree robbery and two counts of first degree aggravated murder. On April 29, 1982, after 2 days' deliberation, the jury

returned a verdict of guilty on all counts.

The sentencing phase of the trial began on May 3, 1982. At that proceeding the defense moved to exclude evidence relating to various weapons found in defendant's home. The defense also moved to admit the evidence that Monte Yovetich had failed his polygraph examination. (A similar offer of proof was made during the guilt phase.) Both motions were denied. At the conclusion of the proceeding, the jury was instructed:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

Instruction 2. Report of Proceedings, at 2579. The jury concluded that there were insufficient mitigating factors to justify leniency. After denying defendant's motion for a new trial, Judge Henry sentenced defendant to death. The case was then forwarded to this court for automatic review.

## CONVICTION

### I

Defendant first attacks the trial judge's failure to grant a change in venue.

A motion for change in venue should be granted when necessary to effectuate the defendant's due process guaranty of a fair and impartial trial. *See State v. Stiltner,* 80 Wn.2d 47, 491 P.2d 1043 (1971). The defendant need only show a probability of unfairness or prejudice. *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966). The decision to grant or not grant a motion for venue is discretionary. Courts are reluctant to disturb such a ruling, however, absent a showing of abuse of discretion. *Stiltner,* at 52.

In the instant case, defendant asserts that the trial judge abused his discretion. Citing *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479 (1974), he argues that the factors discussed therein support the proposition that the trial judge should have granted a change of venue.

*Crudup* states that the following criteria are to be considered: (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn. *Crudup,* at 587.

Respondent also relies on *Crudup* but applies its criteria differently to reach, of course, the contrary conclusion.

Although the factors discussed in *Crudup* may not be dispositive of every change of venue case, they aid our inquiry here. Applying these factors then, and having reviewed the materials submitted in support of defendant's change of venue motion, we conclude that the trial judge did not abuse his discretion. Although the publicity was widespread, it was largely factual in nature. The articles described the crime, the victims and the police investigation. The crime, rather than the publicity itself, generated public reaction. Also, some time passed between the crime (and its attendant publicity) and the trial. Five months may not be characterized as a substantial time period; still, it did aid in dulling the sharp reaction of the community evident immediately thereafter. Furthermore, the pretrial publicity did not make it overly difficult to obtain a jury. There was a large pool of jurors (63,000) from which to choose and no jurors questioned indicated a predisposition against the defendant. Finally, the defendant did not use five available peremptory challenges, presumably because he was satisfied with the makeup of the jury.

On the other hand, the charges filed in this case were the most severe the State could charge. On balance, however,

we find the trial judge did not abuse his discretion in denying defendant's venue motion.

## II

Issues 2 and 3 both deal with the admissibility of certain statements defendant made to the police. Generally, defendant argues that his confessions are inadmissible because he was improperly advised of his constitutional rights, because the statements were the result of coercive interrogation and because the recording procedures used in taping the statements violate the provisions of RCW 9.73. Each of the allegations will be dealt with individually.

### A. *Advisement of Constitutional Rights*

The procedural safeguards of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966) are well known. Before an individual who has been taken into custody can be questioned, he must be given this basic advisement: He must be warned that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to an attorney, and that if he cannot afford one, an attorney will be appointed for him prior to any questioning. *Miranda,* at 479.

In the present case, defendant was advised of his rights just prior to taking the polygraph examination. The *Miranda* warnings were read to him and he was then given a combined "Rights Warning—Waiver Certificate" and "Polygraph Examination Statement of Consent" form to sign. Plaintiff's exhibit 1, Omnibus Hearing.

Defendant admits signing the waiver but asserts that these warnings were insufficient to satisfy the requirements of *Miranda.* He alleges first that the warnings were inaccurate. Polygraph statements, he argues, cannot be admitted in court absent a stipulation: if the defendant knew this fact, it could have lured him into a false sense of security, making the warnings ineffectual. Brief of Appellant, at 49. This argument is without authority and without merit. An advisement of rights does not purport to address

intricate evidentiary questions. Furthermore, defendant's position misstates the rules pertaining to admissibility of polygraph examinations. As respondent points out, it is the results of polygraph examinations, not statements made during the examination, which are inadmissible. *See Wyrick v. Fields*, 459 U.S. 42, 48 n.\*, 74 L. Ed. 2d 214, 103 S. Ct. 394 (1982).

■ Defendant next asserts that the advisement given prior to the polygraph examination was an improper statement of Washington law and therefore inadequate. The advisements defendant received stated that "[a]nything I say or sign can be used against me." Plaintiff's exhibit 1, Omnibus Hearing. Defendant asserts that the proper advisement, as contained in *State v. Creach*, 77 Wn.2d 194, 461 P.2d 329 (1969), must inform the defendant that "any statement . . . *can and will* be used as evidence against him". (Italics ours.) *Creach*, at 199. We are not persuaded by defendant's argument. Recently, the Supreme Court also rejected the notion that *Miranda* warnings must follow, word for word, the language of that opinion. In reversing a California Court of Appeal decision, the Court stated that the warnings need not be an incantation of the precise language contained in *Miranda*. *California v. Prysock*, 453 U.S. 355, 69 L. Ed. 2d 696, 101 S. Ct. 2806 (1981) (per curiam).

We agree with the reasoning of *Prysock*. The essence of the *Miranda* warnings is that the defendant be advised of his rights in a way which conveys their full import. Defendant received such warnings. The statement "anything you say can be used against you" sufficiently alerts a defendant that his statements may be used in court. Furthermore, the statement of rights defendant received is identical with that contained in *Miranda*. Consequently, we find that the statement of rights was sufficient to adequately inform the defendant of his constitutional rights.[3]

---

[3]We also reject defendant's unsupported allegation that the police were required to advise him that the crime of which he was suspected carried a possible

■ Defendant next asserts that the statements should be suppressed because he did not sign a written waiver of his constitutional rights. This argument was explicitly rejected in *North Carolina v. Butler,* 441 U.S. 369, 373, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979). There the Court observed:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.

Here, the trial court specifically found that defendant "made a knowing, intelligent, and voluntary waiver of those [constitutional] rights". Conclusion of law 4. Having reviewed the record, we agree. The testimony indicates that defendant was generally aware of his legal rights but waived them. Defendant was advised of his rights prior to the polygraph examination, was asked if he understood them, and agreed to sign a written waiver/polygraph consent form. Following the polygraph examination, defendant, after again being asked if he understood his rights, confessed.[4] We find that this evidence supports the trial judge's conclusion that the defendant knowingly waived his constitutional rights.

### B. *Voluntariness of Confession*

Defendant alleges that his confession was involuntary because it was brought about by psychologically coercive police interrogation techniques. We disagree.

---

death penalty. Having been advised that he was a suspect in a multiple murder–robbery, defendant undoubtedly knew that the crimes carried severe sanctions.

[4]Defendant also urged that he should have been advised of his rights again when he technically became a suspect. This court has often stated that a defendant need not be repeatedly advised of his rights once he has been adequately and effectively warned. *State v. Gilcrist,* 91 Wn.2d 603, 607, 590 P.2d 809 (1979). Our conclusion that he was effectively advised of his rights shortly before becoming technically in custody thus disposes of this issue.

■ To be voluntary, a confession must be the product of a rational intellect and a free will. *Mincey v. Arizona,* 437 U.S. 385, 398, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978). In determining voluntariness, the Court evaluates "all the circumstances of the interrogation". *Mincey,* at 401. The Court has considered the physical condition of the defendant (*Mincey,* defendant wounded and in great pain); his mental abilities (*Davis v. North Carolina,* 384 U.S. 737, 16 L. Ed. 2d 895, 86 S. Ct. 1761 (1966) (low intelligence)); and the conduct of the police (*Spano v. New York,* 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202 (1959) (police used close friend to interrogate; informed defendant that friend would lose job if no confession)); (*Davis,* police isolated defendant for 16 days with minimal food).

Viewing the totality of the circumstances, we conclude that defendant's confession was voluntary. The police tactics employed were neither overly zealous nor coercive. They consisted solely of psychological appeals to defendant's conscience. Such appeals might result in an involuntary confession where the defendant is in a weakened physical or emotional state or of below normal intelligence. Defendant here, however, did not have these handicaps. In fact, the record indicates that defendant had been schooled in the art of resisting coercive interrogation in conjunction with his military training. It was unlikely, therefore, that his will was overborne by Officer Midthun's rather elementary interrogation skills.

■ Despite these facts, defendant apparently would have this court adopt a rule that interrogations by polygraphists are inherently coercive. To support this novel proposition, he cites several cases, including *People v. Zimmer,* 68 Misc. 2d 1067, 329 N.Y.S.2d 17, *aff'd,* 339 N.Y.S.2d 671 (1972); *State v. Green,* 271 Or. 153, 531 P.2d 245 (1975); and *United States ex rel. Monks v. Warden, N.J. State Prison,* 339 F. Supp. 30 (D.N.J.), *aff'd,* 474 F.2d 1337 (3d Cir. 1972). Defendant's authority does not support this proposition. In *Zimmer,* the defendant was given a polygraph examination 2 days after her infant daughter's death.

Pursuant to an investigation of the child's death, the defendant agreed to the polygraph examination. During the examination, the defendant was "obviously emotionally upset." *Zimmer,* at 1070. A psychiatrist who examined Ms. Zimmer the day following her confession concluded that the statement was coerced and that she was not possessed of "a free and voluntary state of mind, and was not in conscious control of herself at the time the statement was taken." *Zimmer,* at 1071. In the present case, defendant can show no similar emotional distress or intellectual impairment. Similarly, the case of *United States ex rel. Monks v. Warden, N.J. State Prison, supra,* is unlike the facts here. There, the defendant, a boy of 15, was held 8 days and subjected to repeated interrogations, including nine lie detector tests. No comparable police conduct is alleged in the present case.

In summary, then, we believe that the defendant's statements were the product of his own free will and thus admissible at trial.

## C. *RCW 9.73 Violations*

Defendant's final attack on the admissibility of his statements concerns various violations of RCW 9.73. That chapter circumscribes the use of tape recordings and requires that specific protections accompany the recording of statements made by arrested persons. The statute allows police to tape statements of arrestees if (1) the arrested person has been informed that the statement is being taped and the statement so informing him is included on the tape; (2) the tape contains an indication of the starting time and the termination time; and (3) the person has been fully informed, on tape, of his constitutional rights. RCW 9.73-.090(1)(b).

In *State v. Cunningham,* 93 Wn.2d 823, 613 P.2d 1139 (1980), we indicated that recordings must strictly conform to the statutes so as to "ensure that waiver by consent authorized by RCW 9.73.030 is capable of proof by the recording itself". *Cunningham,* at 829. The court found

that it was error (albeit harmless) to allow tapes into evidence which did not contain a starting time nor a full statement of the defendants' constitutional rights. *Cunningham,* at 830.

In *State v. Jones,* 95 Wn.2d 616, 628 P.2d 472 (1981), we again interpreted RCW 9.73.090. In *Jones,* we found that the statute was not violated even though the tape did not contain the required statement that a recording was being made. In coming to that conclusion, this court looked to the circumstances surrounding the taping. The evidence there demonstrated that the police officer had made statements regarding the taping of the conversations. In addition, the tape recorder was sitting on the table directly in front of the defendant. Under these facts, we agreed that the defendant knew the statements were being recorded. We concluded, therefore, that the tape recording conformed to the statute. *Jones,* at 627.

We believe a similar analysis should be applied here in reviewing each of the five separate statements at issue.

Defendant's initial statement was taken on the day of the crime, September 17, 1981. As defendant was not in custody at the time, the police were required to comply with the terms of RCW 9.73.030 rather than 9.73.090.

That statute requires that all parties to a taped conversation give their consent to the taping. The tape must also contain a statement that the conversation is being recorded. RCW 9.73.030(3). The statement of September 17, 1981, does not comply with this requirement. Nowhere on the tape does the fact of its being taped appear. Thus, we find that this statement violated the terms of the statute. RCW 9.73.050 provides that information obtained in violation of this statute is not admissible in any civil or criminal proceeding. Thus, the admission of evidence obtained from this taped statement was error.

Having found a violation of the statute, we still must determine whether use of the taped statement resulted in prejudicial error.

In *State v. Cunningham, supra,* we held that errors

in admitting such evidence are nonconstitutional errors subject to the standard of "reasonable probabilities." *Cunningham*, at 831, states the complete formula:

It was a statutory violation. Accordingly, the stringent standard of proving "harmless error beyond a reasonable doubt" is inapplicable. *State v. Nist*, 77 Wn.2d 227, 461 P.2d 322 (1969). We apply instead the rule that error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.

We believe the admission of Officer Mauer's testimony concerning defendant's statement did not prejudice the defendant because the statement did not contain any directly incriminating evidence. The statement simply illustrated that there were inconsistencies in defendant's initial statements to police. Furthermore, these same inconsistencies were revealed in later, nontainted conversations with police on the same day.[5] Finally, the remaining evidence at trial clearly supports the proposition that the result was not materially affected by admission of this evidence.

Defendant next attacks the admission of statements made during and immediately following his polygraph examination. He asserts that RCW 9.73.050 prohibits use of information obtained during the examination (and subsequent interview) because the tape does not contain an advisement of the fact that it is being recorded or consent to the recording as required by RCW 9.73.030. Defendant's

---

[5]Under our recent opinion in *State v. Lavaris*, 99 Wn.2d 851, 664 P.2d 1234 (1983), subsequent statements by a defendant may be inadmissible if they are caused by an earlier inadmissible statement. *Lavaris,* however, involved the issue of whether a subsequent confession is inadmissible if the first confession is obtained without proper *Miranda* warnings. In holding that the statements there were inadmissible, this court held that the subsequent confession was tainted by the first.

A nonincriminatory statement, such as we have here, however, does not give rise to the same concerns as those of a confession. When dealing with the admissibility of a confession, courts must be concerned that the defendant may continue to confess because he believes it is too late to do anything about his initial statement. No similar problems arise from nonincriminatory statements.

argument is without merit. The tape in question does contain the requisite advisement. Prior to beginning the polygraph examination, Officer Midthun advised defendant of his constitutional rights and read him the consent form for the polygraph examination. The consent form states quite clearly that the "examination will be monitored or recorded." Plaintiff's exhibit 11, at 3, Omnibus Hearing. Although defendant's consent to have the statement taped does not appear therein, this is not required by RCW 9.73-.030. The statute provides that

consent shall be considered obtained whenever one party has announced to all other parties . . . that such communication or conversation is about to be recorded or transmitted: *Provided,* That if the conversation is to be recorded that said announcement shall also be recorded.

RCW 9.73.030(3). As the requisite announcement was made, the statute was not violated.

A different problem arises from the taping of defendant's next statement. Following the polygraph examination, Officer Midthun informed defendant of his belief that he was either involved in the crimes or had knowledge of them. Finding of fact 58. Defendant, after first denying knowledge or involvement in the crimes, said he thought a friend had done it and then admitted that he had done it. He then briefly gave the details of the crimes. Finding of fact 60.

Officer Midthun asked defendant if he would talk to Detective Shultz. Defendant agreed and Detective Shultz changed places with Officer Midthun. During the subsequent taped interview, defendant described the events leading to the deaths of the two bank tellers. It is this statement which defendant contends violates RCW 9.73-.090.

RCW 9.73.090, unlike RCW 9.73.030, applies specifically to individuals who have been arrested. To apply this statute, we must resolve whether defendant was arrested at the time he gave this statement to Detective Shultz.

The classic definition of arrest consists of "'. . . the apprehending or restraining of one's person, in order to be

forthcoming to answer an alleged or suspected crime.'" E. Fisher, *Arrest* 7 (1967) (quoting 4 W. Blackstone, *Commentaries* \*288, \*289). The necessary first step in determining whether there has been an arrest is to ask whether the individual was free to leave the presence of the police. 2 W. LaFave, *Search and Seizure* § 5.1(a) (1978).

A second element of arrest is the likelihood that the present confinement will be accompanied by future interference with the individual's freedom of movement. *Terry v. Ohio*, 392 U.S. 1, 26, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). This element reflects the common law notion that an arrest is more than a present confinement. To be an arrest, confinement should simply be the initial action in criminal prosecutions.

We conclude that defendant was arrested for purposes of this statute immediately upon confessing to the crimes. The combination of defendant's confession and the mounting circumstantial evidence against him (*e.g.*, inconsistent statements to police about apparel, presence of blood–spattered checkbook at scene, and admitted financial difficulties) were sufficient evidence to establish probable cause to prevent defendant from leaving the police station. This, in fact, was the conclusion reached by the trial judge. See finding of fact 60.

The notion of present confinement for future accountability is also present in defendant's case. Once he admitted guilt to a specific crime, defendant set in motion a chain of events leading inevitably to his confinement for future prosecution.

Having concluded that defendant was under arrest, it follows that RCW 9.73.090 applies to defendant's statement to Detective Shultz. We must now decide whether that statement conforms to the terms of the statute. We hold that it does.

As previously noted, the statement at issue followed immediately after the conversation with Officer Midthun. The trial judge found that between these two statements, approximately 1 minute elapsed. Officer Midthun left the

room and Detective Shultz arrived immediately. This short period of time leads us to conclude that the interrogations were one transaction. Thus, for purposes of evaluating whether the terms of RCW 9.73.090 have been complied with, we view the two statements as one.

▮ Taken together, the only defect in the taping procedure of these statements was the failure to specify the starting time of the polygraph examination. All of the other requirements were met. The polygraph statement was preceded by an advisement of defendant's constitutional rights and a notification of the fact that the statement was being taped. When Detective Shultz came into the room, defendant was reminded of his rights and asked whether he understood them. He responded in the affirmative. He was told again that the statement was being taped and at the tape's conclusion, the detective announced that the tape ended at a specific time. These procedures substantially comply with the statute and provide the necessary safeguards intended by the statute. The resulting information was therefore admissible.[6]

Defendant next challenges a statement made during the evening of September 22, 1981, and one given early the next morning. These tapes contain the following violations of RCW 9.73.090. The tape taken during the evening of September 22 contains no statement of its starting time, and no statement that the interview was being taped.

The statement taken early the next day does not contain a statement of defendant's rights, although it does have a reference to the rights having been read. Thus, neither of these statements complies with the terms of the statute. We find, however, that defendant was not prejudiced by their admission. As discussed elsewhere in this opinion, the evidence of guilt was overwhelming. In addition, the critical

---

[6]This is not to say that all taped statements that contain this defect (no starting time) will be admissible. Where the starting and ending times of a statement are important in reviewing allegations of police misconduct or unauthorized editing of the tape, the time announcements may assume critical importance. No such allegations are present here.

information contained in these two statements was largely cumulative of that obtained in the previous interviews. Under these facts, we do not believe defendant was prejudiced by use of the tapes.

## III

Our next inquiry is whether defendant's trial was tainted by the admission of improper prejudicial evidence. Defendant alleges several errors, each of which will be dealt with separately. Before reaching these issues, however, an initial discussion of our evidence rules is needed.

■■■ Admissibility of evidence is determined, generally, by Rules of Evidence 401, 402 and 403. ER 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 402 states simply that relevant evidence is admissible. ER 403, on the other hand, allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". Unfair prejudice is that which suggests decision on an improper basis, commonly, though not necessarily, an emotional one. Fed. R. Evid. 403, Notes of Advisory Committee on Proposed Rules. These rules, in effect, require that the trial judge carefully balance the evidence's relevancy against its prejudice. Normally, the trial judge's decision will not be overturned absent a showing of abuse of discretion. *See State v. Crenshaw,* 98 Wn.2d 789, 659 P.2d 488 (1983) (admission of photographs within judge's discretion).

### A. *Admission of 911 Tape*

Defendant first attacks the admissibility of the taped conversation between Michael Capron and the county dispatcher. The tape illustrates the highly distraught response of a husband upon first finding his wife lying in a pool of her own blood. It is, without a doubt, an extremely emotional experience to listen to this tape. The court has done

so. We conclude that notwithstanding its strong emotional appeal, the trial judge did not abuse his discretion in admitting the tape during the guilt phase.

Defendant asserts that this evidence was inadmissible because its prejudice far outweighed whatever relevancy it might have possessed. The State counters with the argument that the tape was highly relevant to rebut defense counsel's suggestion, during opening statement, that Michael Capron was responsible for the crimes. In his reply brief, defense counsel denies making accusatory statements concerning Michael Capron. The statements referred to by the State appear below:

> So she [Ann Marie Gianoulakis] calls the bank. She's known Candy Hemmig professionally, had professional dealings with her at the bank. She calls the bank. This is the same phone call that the state says they will prove Mike Capron answered, and immediately started screaming into the phone.
>
> The phone is picked up at the other end, at the bank. Mrs. Gianoulakis doesn't hear what she expects to hear. She didn't hear: Hello, this is the Tumwater State Bank.
>
> What her immediate reaction was is a bunch of women arguing. She hears more than one person. It's a bunch of women arguing. That is what her reaction was to the police.
>
> She's about to hang up, because she thinks she's got the wrong number. She listens for a few moments, and all she hears is this background, not somebody talking into the receiver, this background argument.
>
> She is about to hang up when she hears not: This is Mike. Twila's been shot, but: This is Candy. Mike's been shot. Telephone call ends.
>
> The important thing to remember about that is the arguing, and at that time Mrs. Gianoulakis wasn't hysterical. She wasn't upset. She was making a normal phone call, and this is what she heard.
>
> That is the state's case. They will *present evidence that that phone call was received in the bank, Mike Capron was the only one alive in the bank, or at least the only one that could talk.* Who was arguing in the background.

(Italics ours.) Report of Proceedings, at 47–48.

We agree with the State that this passage suggests a defense theory that Michael Capron was responsible for the murders. We agree also that the tape was relevant to rebut this inference. Turning to the second step, whether the evidence's prejudice outweighed its probative value, we conclude it did not. The tape, though extremely emotional, did not implicate defendant but rather directed sympathy to the victims. Under these circumstances, we believe the trial judge did not abuse his discretion in admitting the tape.

On the other hand, the emotional impact of this tape may have a prejudicial effect on the penalty phase of the trial. To guard against prejudice, the tape should not be played to the jury during the new sentencing proceeding.

### B. *Predeath Photographs*

We reach a similar conclusion on the admission of the victims' photographs. Defendant urges that photographs taken of the victims before the incident were irrelevant and prejudicial.

The State counters with the argument the photographs were relevant to establish the identity of the victims. We need not resolve this issue, however, because we believe any error would be harmless. The photographs are not of the type which generate prejudice or an emotional reaction against defendant. Finally, as noted above, the overwhelming evidence of guilt satisfies us that the jury verdict was not affected by the admission of this evidence. As the question of identity is not in issue at a sentencing hearing, the pictures should not be admitted in the subsequent proceeding.

### C. *Hearsay Statements*

The next evidentiary error alleged in this case relates to the testimony of two individuals who saw defendant at a conference the weekend following the murders. Officer Dale W. Mattson, a deputy sheriff for Mason County, testified that he had a conversation with defendant. Mattson told defendant that he resembled the police description of a

suspect in the murders. Officer Mattson then testified to Rupe's reaction. He stated that "[h]e [defendant] stammered a bit. I felt I offended him." Report of Proceedings, at 1352. Another law enforcement officer, who was also present during this conversation, testified that defendant stammered and looked surprised when informed of the resemblance.

Defendant makes two arguments in support of his position that this evidence is inadmissible.

He contends first that the evidence is irrelevant. We disagree. Defendant's apparent embarrassment when told that he resembled a murderer is relevant, as the evidence has some tendency to increase the probability of defendant's guilt. It is unlikely that an innocent party would react in such a way.

Defendant next argues that the evidence was inadmissible hearsay. This argument is without merit. Hearsay is an out–of–court statement offered to prove the truth of the matter asserted. ER 801(c). This evidence was not offered to prove the truth of the matter asserted and thus was not hearsay. Furthermore, the evidence also would be excepted from the hearsay rule as an admission by the defendant. *See* ER 801(d)(1)(i).

## IV
### A. *Polygraph*

Defendant raises several due process issues. He argues first that he was denied due process by the trial judge's decision to exclude the results of Monte Yovetich's polygraph examination. Monte Yovetich was a key witness in the State's case. He linked the money and gun to defendant. Also, many of the facts are consistent with two theories—either that defendant committed the crimes or that Monte Yovetich did. Monte Yovetich failed his polygraph examination but the trial judge refused to admit the test results absent a stipulation. Defendant attacks the exclusion of this evidence, arguing that it denied him due process. He urges that these results were relevant because

Yovetich's failure of the test cast suspicion on his story and the State's version of the day's events. Although the evidence may have been relevant, we cannot agree with defendant's assertion that this relevancy required the trial judge to admit the test's results.

Defendant starts, as does the prosecution, with the general rule that polygraph examinations are inadmissible in this state absent stipulation. *State v. Renfro,* 96 Wn.2d 902, 905, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982); *State v. Young,* 89 Wn.2d 613, 574 P.2d 1171, *cert. denied,* 439 U.S. 870 (1978); *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974). Defendant distinguishes these cases by noting that his case, unlike those cited, raises a Sixth Amendment issue concerning his right to confront witnesses and produce evidence in his favor.

Under the facts of this case, we are not persuaded that defendant's right to present evidence in his favor has been unfairly circumscribed. The United States Supreme Court, in commenting on the importance of the Sixth Amendment right to present witnesses, recognized the right's principal limitation—that of reliability.

In the exercise of this [Sixth Amendment] right, the accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

*Chambers v. Mississippi,* 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973).

The evidence offered by the defendant simply does not reach the minimal threshold of reliability necessary to its admission in a criminal proceeding. In addition to the questionable reliability of polygraph examinations, the present polygraph examination has other trustworthiness problems. The polygraphist concluded, during defendant's offer of proof, that he doubted the test's validity. He cited Monte Yovetich's lack of sleep, hostility to the police and nervousness as factors which possibly affected the test results.

Moreover, the results of the polygraph examination were

further undercut by subsequent events. The polygraph charts indicate that Yovetich was lying when he answered the following question: "Did you lie when you said you threw the gun off the Hartstene Island bridge?" In response to this question, Monte said "no". The polygraph results showed that Monte was lying when he answered this question, but subsequent events suggest that he was telling the truth. For instance, the gun was located precisely where Yovetich stated he had thrown it. Combined, this fact and the polygraphist's testimony convince us that defendant's Sixth Amendment rights were not violated by exclusion of the evidence.

Our resolution of this issue also disposes of issue 12 concerning the admission of the polygraph examination during the sentencing phase of defendant's trial. Although we recognize that death sentencing proceedings involve interests that require more relaxed evidentiary rules when considering evidence in defendant's favor, we cannot go so far as to permit clearly unreliable evidence to be introduced. We hold, therefore, that polygraph examinations will not be admitted in those limited cases where their trustworthiness is seriously in doubt. *Cf. State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II).

## B. *Exculpatory Evidence*

Turning to the next due process claim, defendant argues that he is entitled to a new trial because the prosecutor failed to disclose exculpatory evidence—the statements of one Donna Wright. Mrs. Wright, when interviewed on the day of the murders, indicated that she saw a dark blue Bronco vehicle leaving the bank parking lot between 11 and 11:10 a.m. See Brief of Appellant, apps. A, B. This statement was provided to the defendant prior to trial. It simply was not flagged as "exculpatory" evidence. We disagree with defendant's conclusion that this omission denied him due process. By turning over the names and the statements, the State complied with its obligation.

## C. *Prosecutorial Misconduct*

Defendant's final attacks on his conviction implicate the conduct of the prosecuting attorney. Defendant asserts that the prosecutor exceeded the scope of proper cross examination by inquiring as to his experience as a security officer in the army. Generally, questions concerning the scope of cross examination are left to the sound discretion of the trial judge. *State v. Jeane*, 35 Wn.2d 423, 431, 321 P.2d 633 (1950). Here, we conclude the trial judge did not abuse his discretion. The record indicates that defense counsel initially inquired into defendant's background and experiences. This line of questioning opened the door for questions concerning defendant's other work experience. We find no abuse of discretion in allowing this cross examination.

Finally, defendant urges that he also was deprived of due process of law by the prosecutor's questions during cross examination.

Defendant contends that the prosecutor improperly inquired as to whether defendant had informed anyone, previous to trial, of his belief that Monte Yovetich had committed the crime. Defendant argues that he was prevented from giving a complete answer to this question. Defendant's only previous reference to someone else committing the crime was made during the polygraph examination. He argues that the inadmissibility of the polygraph examination thus compelled him to answer the question in the negative. He contends the prosecutor deliberately made this reference, knowing that defendant would have to deny that he previously accused Monte.

This argument is without merit. First, defendant could have answered the question affirmatively without referring to the polygraph examination. Second, if defense counsel believed that his client incorrectly felt that he could not refer to the version of his story given after the polygraph examination, he could have rehabilitated his witness on redirect examination. He did not. This incident did not deny defendant a fair trial.

## V

Defendant next brings a constitutional challenge to his robbery convictions. He asserts that he was placed in double jeopardy by his conviction on two counts of robbery.

As to the first contention, we believe defendant's multiple convictions for robbery are valid. RCW 9A.56.190 defines robbery as the unlawful taking of personal property from the person of another, or in his presence against his will by the use or threatened use of immediate force, violence or fear of injury to that person or his property or the person or property of anyone.

Defendant argues that since the money was owned by the bank, only one robbery occurred, even though the money was taken from the possession of two different individuals. We disagree. The robbery has several distinct elements: the taking of the personal property and the use or threat to use force on an individual. The statute does not require that the person from whom the property is taken own that property. Possession or custody will suffice. Here, each teller was individually responsible for money in her till. Each had control and possession of that money and each had the money taken by the use of force. These facts constitute two separate robberies and the double convictions do not place defendant in double jeopardy. *See Watkins v. State,* 413 So. 2d 1275 (Fla. Dist. Ct. App. 1982).

## VI

Defendant next asserts that there was no evidence to support two of the three statutory aggravating factors on which the jury was instructed. The jury was instructed that it should consider whether the murders were committed to conceal the identity of defendant; whether the crime involved multiple victims who were killed pursuant to a common scheme or plan; and whether the murders occurred during the course of a robbery.

Defendant admits that the murders occurred during the course of a robbery but asserts that there is no evidence that the murders were committed to conceal the identity of

the murderer or that the murders were part of a common scheme or plan. We disagree. The State presented evidence that defendant was well known to the victims. Defendant acknowledges that he had conducted business at the Tumwater State Bank for several months. Moreover, defendant testified that he had been in the bank several times the week of the crime. From this evidence, the jury could infer that defendant planned to murder both tellers in order to avoid detection. This evidence is sufficient to establish both statutory aggravating factors challenged by defendant. The jury was entitled to believe that no one would enter a bank where he was well known, intending only to rob it, thereby leaving two witnesses who could identify him and provide police with information, such as his name and address, which would lead inevitably to his arrest. The evidence that defendant was well known at the bank was thus sufficient circumstantial evidence, under the facts of this case, for the jury to conclude that defendant intended to kill both tellers to conceal the crime.

## VII

Defendant challenges the composition of the jury and the process by which it was selected. Relying on *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968) and *Hovey v. Superior Court,* 28 Cal. 3d 1, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980), defendant moved, prior to trial, to prohibit the State from questioning the members of the jury panel about their views on capital punishment. This motion was denied. During voir dire, the panel was questioned individually, while the remaining panel members were secluded and asked whether they could impose the death penalty.

Although the State challenged several jurors, none were excused on the ground that they could not impose the death penalty. Several jurors were excused, however, when they voiced opinions that reflected too great a willingness to impose death sentences. Despite these precautions, defendant asserts that the process of death qualifying a

jury denied him due process of law.

The landmark case on this issue is *Witherspoon v. Illinois, supra.* In *Witherspoon,* the defendant was convicted of murder and sentenced to die by a jury from which the prosecutor had removed for cause all prospective jurors who had "conscientious scruples against capital punishment, or [were] opposed to the same.'" *Witherspoon,* at 512. On appeal, the defendant urged that the jury was unconstitutionally biased in favor of both conviction and death.

The Supreme Court reversed Witherspoon's death sentence but upheld the underlying murder conviction. Concerning the penalty imposed, the Court held it "self–evident" that if prospective jurors are excused for cause based on general objections to the death penalty or conscientious or religious scruples, the resulting jury "cannot speak for the community" and is "uncommonly willing to condemn a man to die." *Witherspoon,* at 520, 521. The only prospective jurors who could constitutionally be excused for cause were

> those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Witherspoon,* at 522 n.21.

The Court refused to reverse Witherspoon's conviction for murder. It found the empirical studies tendered on his behalf "too tentative and fragmentary" to establish that the broad exclusion of "death scrupled" jurors "results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon,* at 517, 518. Witherspoon had specifically declined to present evidence below to support his contention. The Court found, therefore, that it could only speculate as to the precise meaning of terms used in the studies, the accuracy of the techniques employed, and the validity of the generalizations made.

Nevertheless, the Court left the question open for some future defendant to attempt to establish that "death qualification" results in a jury which is less than neutral with respect to guilt. *Witherspoon,* at 520 n.18.

Prior to trial, defendant here submitted several studies that attempt to establish the proposition that jury panels from which jurors who oppose the death penalty are excluded, are conviction prone. In addition, he moved for a continuance in order to obtain the results of a new study on the topic. This motion was denied.

On appeal, defendant asserts the trial judge erred in not granting either the motion to prohibit death qualification or the motion for a continuance. The State responds by pointing out that the studies cited by defendant all attempt to establish that only the exclusion of jurors opposed to the death penalty results in a conviction–prone jury. From this fact, the State reasons that the cited studies are inapplicable to defendant's case, since no jurors were excused due to their views concerning the death penalty. We agree.

*Witherspoon* and its progeny insure that a cross section of the community is obtained by allowing jurors who have capital scruples to serve on the panel. Two such jurors served on this panel. See Voir Dire Report of Proceedings, at 310–13, 434. The fact that no jurors who absolutely opposed the death penalty served was the combined result of the random selection process and the State's exercise of peremptory challenges. Defendant thus cannot, on this record, prove that the jury panel was not a fair cross section of the community.

Defendant's next argument attacks the *process* of death qualification. Relying on *Hovey v. Superior Court, supra,* he alleges in essence that when a jury is questioned about the death penalty, it forms a predisposition to convict. Defendant offers no evidence to substantiate this allegation. Furthermore, his reliance on *Hovey* is misplaced. In *Hovey,* the defendant presented evidence which demonstrated that the process of questioning a jury about capital punishment predisposed the panel to conviction. The Cali-

fornia court recognized the dangers of death qualification. It concluded, however, that the risk of taint would be sufficiently minimized by individual questioning apart from the jury panel. Where, as here, jurors are questioned individually and the trial judge and counsel each carefully emphasize, to prospective jurors, that they may not draw inferences of guilt from the questioning, we believe the possibility of tainting the jury is so minimal that the procedures satisfy due process. We conclude, therefore, that defendant was not denied due process by the death qualification procedure.

## DEATH SENTENCE

We turn now to defendant's argument concerning his death sentence. Defendant initially attacks the constitutional validity of the death penalty statute, RCW 10.95. He then argues that the trial judge erred in admitting certain aggravating evidence and in instructing the jury. Finally, he argues that his sentence cannot survive review by this court under the terms of RCW 10.95.130. We reject defendant's challenges to the death penalty statute, but do not reach the issue of statutory review for the reasons set out below.

## VIII

Defendant raises several constitutional challenges to the death penalty statute. He first argues that the death penalty is per se unconstitutional. Defendant admits that the United States Supreme Court has rejected the argument that capital punishment is a per se violation of the United States Constitution (*Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)) but urges that this court should find the death penalty per se unconstitutional under our state constitution, Const. art. 1, §§ 3, 14. As defendant correctly points out, this argument was not raised in *State v. Bartholomew,* 98 Wn.2d 173, 180, 654 P.2d 1170 (1982) (*Bartholomew* I).

Defendant offers the following arguments in support of his position. First, the killing of another human being is undoubtedly cruel. Second, the State has not

shown that the death penalty has a deterrent effect on others. Third, any death penalty statute will be arbitrary and capricious because it cannot be applied evenly to those who commit similar criminal acts. The defendant then cites *People v. Anderson,* 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152 (1972) in which the California court ruled that the state's constitution did indeed prohibit the death penalty.[7] Defendant's arguments were addressed by the Supreme Court in *Gregg,* and we find that analysis equally applicable here. Defendant does not offer any persuasive reasons why our state constitution requires a different resolution of these issues.

In addition, although *Bartholomew* I did not address itself to the per se argument, we certainly were aware of our power to do so when that case was decided. Thus, our decision in *Bartholomew* I implicitly rejects defendant's argument.

Furthermore, we believe that to hold that the death penalty is per se unconstitutional would be to substitute our moral judgment for that of the people of Washington. We, like the court in *Gregg,* recognize that

> the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Furman* v. *Georgia,* [408 U.S. 238 (1972)] at 383 (Burger, C. J., dissenting).

*Gregg,* at 175–76. Consequently, we reach a similar conclusion under our state constitution as the United States Supreme Court reached in *Gregg* and hold that our state provision does not prohibit the imposition of the death penalty in all cases. So long as the sentencing procedures sufficiently protect against juries imposing the death pen-

---

[7] In response to *People v. Anderson, supra,* however, the people of California promptly amended the constitution. *See* Cal. Const. art. 1, § 27. That amendment states simply that the death penalty shall not be deemed to be or constitute the infliction of cruel or unusual punishments, thus effectively overruling *Anderson.*

alty in an arbitrary manner, the death penalty is not per se unconstitutional.

Defendant next asserts that our statute does not adequately guard against arbitrary infliction of the death penalty. As most of defendant's arguments were raised and rejected in *Bartholomew* I, our discussion here will be abbreviated.

Defendant first contends that under Washington's statute the jury is given excessive discretion as to which persons who are convicted of aggravated murder in the first degree will be put to death. We disagree. The United States Supreme Court has required that any death penalty statute meet the following test:

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."

*Bartholomew* I, at 189 (quoting *Godfrey v. Georgia,* 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980)). In *Bartholomew* I, we compared our statute to this standard and concluded that the Washington procedures conform in broad outline to those schemes already approved by the United States Supreme Court. *Bartholomew* I, at 192. Defendant offers no new analysis as to why we should change our holding in *Bartholomew* I.

Defendant also argues that the statute is unconstitutional because it allows prosecutorial discretion in the decision to seek the death penalty. This argument was rejected by several of the opinions in *Gregg v. Georgia, supra.* Justice Stewart commented, in a footnote, that the argument placed unrealistic and unconstitutional limitations on the legal system. *Gregg,* at 199 n.50. We agree.

Moreover, as Justice White explained in his concurrence in *Gregg,* the grant of discretion to prosecutors does not result in a standardless death penalty statute. The courts may assume that prosecutors exercise their discretion in a manner which reflects their judgment concerning the seriousness of the crime or insufficiency of the evidence. Consequently, the prosecutor's decision not to seek the death penalty, in a given case, eliminates only those cases in which juries could not have imposed the death penalty. We believe that this analysis accurately portrays the function prosecutorial discretion plays in our death penalty statute. This discretion is not unconstitutional.

As a third prong in his argument that the statute allows arbitrary infliction of the death penalty, defendant contends that the review procedures set out in RCW 10.95.130 are inadequate to guard against the arbitrary infliction of the death penalty. As discussed in *Bartholomew* I, at 191–92, the statutory provisions for review are quite broad and certainly pass constitutional challenge.

Defendant's next argument concerning the statute is that RCW 10.95 is inadequate to protect against arbitrary infliction of the death penalty because the jury is not required to be either unanimous in finding aggravating factors or to specify which factors it found. The State, on the other hand, argues that in practice, juries have been required to answer a special interrogatory, setting out the factors which they agreed upon. Furthermore, unanimity was required in the instant case. We find that in defendant's case the statute was applied in a constitutional manner.

We now turn to defendant's argument that the burden of proving the existence of mitigating circumstances was improperly placed on him. He urges that the death penalty is, in effect, an enhancement provision to the crime of aggravated murder. As an enhancement provision, defendant argues, the State should bear the burden of proving the need to impose it by proving the absence of mitigating factors. The present statute, argues the defendant, places this burden upon the defendant. Defendant's argument might

have merit if the statute did indeed place the burden on him; however, a close examination of the language of the special interrogatory required by RCW 10.95.060(4) indicates that the State bears the burden on this issue.

RCW 10.95.060(4) provides:

> (4) Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

Defendant next asserts that the statute impermissibly allows the jury to consider, in answering the special interrogatory, "any relevant factors." He reasons from this phrase that the statute is impermissibly vague. RCW 10.95.070. Defendant's conclusion ignores the beneficial effect of this broad language. With the restrictions placed on this statute by *Bartholomew* I, the broad wording of this section of the statute acts solely in defendant's interest. Furthermore, the constitution requires liberal admission of mitigating circumstances. *See Lockett v. Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). Defendant's argument is thus without merit.

Defendant's final constitutional challenge to the death penalty statute raises the issue of whether allowing an individual a choice between two methods of execution is unconstitutional. The State asserts that giving a defendant a choice of methods is *less* cruel than imposing one method or the other.

In *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981), we rejected the argument that death by hanging was unconstitutional. The broader question, of whether a *choice* between hanging or lethal injection is unconstitutional, has never been at issue in this state.

Neither defendant nor the State offers authority to support their positions. Contrary to both parties' assertions, logic dictates neither result. Individual reactions to the

various methods of execution and the right to choose vary greatly. In some cases, a person may be so appalled by the thought of physically hanging by the neck that the option of death by lethal injection is welcome. To others, the idea of lying strapped upon a gurney awaiting the lethal poison to seep into one's veins at an unknown time may be equally abhorrent. These individuals embrace the idea of choosing the method of their death as a way to avoid their own private terrors. But to a third type of individual, the choice itself is cruel. As they await the day of their death, they are faced not only with the terror of death itself but also with the terror of making the wrong choice on how to die. These individuals do not embrace the idea of choice; they dread its requirement that they take an active part in their own demise.

To resolve this issue either way would require that, in one case or the other, the court's personal view of cruelty prevails over the views of condemned felons. By removing the choice, we impose a cruel punishment upon those who dread a particular method of execution. Retaining the right of choice, on the other hand, may impose severe psychological pressure on those who are frightened of the decision itself.

On balance, on this record, we cannot agree with defendant's assertion that the choice in and of itself is necessarily cruel punishment. The record before us is devoid of any evidence relating to what psychological effect the choice of execution method has upon those sentenced to death. Moreover, defendant does not even allege that he has or will undergo emotional trauma by having to select the method of his demise. He merely asks, as part of a general constitutional attack on the statute, that this court address the issue in the abstract. To accept defendant's argument would require that we speculate as to whether it is more cruel to impose a choice or a given method of execution. This we decline to do.

## IX

Having rejected defendant's attack on the death penalty statute, we turn now to his challenges to the sentencing proceeding. Specifically, defendant challenges the trial judge's decision to allow the State to introduce evidence concerning his gun collection. He asserts that this evidence was irrelevant, prejudicial and violative of his due process rights. We agree with all three contentions.

The challenged evidence included the admission of several weapons: (1) a CAR 15 semiautomatic rifle (civilian version of the military's M–16), (2) a 12–gauge shotgun with one shortened barrel, (3) a .22 caliber rifle, and (4) a pistol with interchangeable barrels. The last item belonged to defendant's landlord. In addition to the weapons themselves, the prosecution presented the testimony of several experts on firearms who alleged that, though the weapons were legal, they were not suitable for hunting or sport.

Michael J. Peck of the Department of Game observed that the CAR 15 was a legal varmint gun but not commonly used. He stated that the CAR 15 was "designed as an anti-personnel rifle." Report of Proceedings, at 2470. Referring to the shotgun with the shortened barrel, he claimed that this weapon was not legal for hunting birds in the state because it was not "plugged". (Another State's witness testified, however, that the gun was of a type which would be used to hunt deer.)

The defense rebutted this inference by establishing that the shotgun was in fact plugged.

Defendant took the stand and testified that he used the CAR 15 for hunting varmints. He explained that he had purchased the gun because it was very similar to the M–16 he carried during his 8½ years in the military. In addition, his ex–girl friend testified that she had defendant's second, full–length barrel for the shotgun.

During his opening statement, the prosecutor sought to portray defendant as an extremely dangerous individual. In arguing to the court for the gun collection's admissibility, he noted that it would give the jury an insight into defend-

ant's personality, because the guns he owned were good for only one purpose, "killing others in combat". Report of Proceedings, at 2431. The prosecution's closing argument emphasized that defendant was a dangerous man because the CAR 15 was "an assault weapon to gun groups of people down in combat situations." Report of Proceedings, at 2587.

Citing our original decision in *State v. Bartholomew,* 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), defendant asserts that a new sentencing proceeding is needed. He argues that it was error to admit his gun collection because it related to nonstatutory aggravating factors. The State counters with the argument that *Zant v. Stephens,* __ U.S. __, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) specifically allows introduction of a wide range of evidence of aggravating factors. Defendant responds by noting, quite correctly, that *Zant* pertains to evidence of convictions. The State asserts that broad language in *Zant,* as well as that found in its companion cases, *Barclay v. Florida,* __ U.S. __, 77 L. Ed. 2d 1134, 103 S. Ct. 3418 (1983), *Barefoot v. Estelle,* __ U.S. __, 77 L. Ed. 2d 1090, 103 S. Ct. 3383 (1983), and *California v. Ramos,* __ U.S. __, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983), strongly suggests that the Court would not agree that the Eighth Amendment requires the restrictions that *Bartholomew* I placed on the admission of aggravating evidence. The State's argument ignores constitutional limitations placed upon admission of evidence by the United States Supreme Court. This limitation, as explained below, requires reversal of defendant's sentence of death and remand for a new sentencing hearing.

 Our analysis starts with the well established rule that constitutionally protected behavior cannot be the basis of criminal punishment. *See Hess v. Indiana,* 414 U.S. 105, 107, 38 L. Ed. 2d 303, 94 S. Ct. 326 (1973) (constitutional guaranties of freedom of speech forbid states to punish use of words or language not within narrowly limited classes of speech); *Stanley v. Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969) (State may not punish

mere possession of obscene material in privacy of home).

To protect the integrity of constitutional rights, the courts have developed two related propositions. The State can take no action which will unnecessarily "chill" or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right. *United States v. Jackson*, 390 U.S. 570, 581, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968) (capital punishment provision of Federal Kidnapping Act unconstitutionally chilled Fifth Amendment right not to plead guilty and Sixth Amendment right to demand jury trial); *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981) (previous Washington death penalty statute needlessly chilled defendant's right to plead not guilty and demand a jury trial); *Griffin v. California*, 380 U.S. 609, 614, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965) (drawing adverse inference from defendant's failure to testify unconstitutionally infringed on defendant's Fifth Amendment rights). *See also State v. Mace*, 97 Wn.2d 840, 650 P.2d 217 (1982) (defendant's post–arrest silence cannot be viewed as evidence of guilt).

The proposition that adverse inferences may not be drawn from constitutionally protected behavior was recently reaffirmed and applied, as a distinguishing factor, to death penalty proceedings. *See Zant v. Stephens, supra.*

In *Zant*, the defendant argued that the fact finder's improper reliance on an invalid statutory aggravating factor required that his sentence be reversed. The Court rejected the argument, finding that

> [i]n this case, the jury's finding that respondent was a person who has a "substantial history of serious assault-ive criminal convictions" did not provide a sufficient basis for imposing the death sentence. But it raised none of the concerns underlying the holdings in [*Stromberg v. California*, 283 U.S. 359 (1931), *Thomas v. Collins*, 323 U.S. 516 (1945), and *Street v. New York*, 394 U.S. 576 (1969)], *for it did not treat constitutionally protected conduct as an aggravating circumstance.*

(Italics ours.) *Zant*, 103 S. Ct. at 2746.

The Court went on to observe that the aggravating circumstances did not authorize the jury to draw adverse inferences from conduct that is constitutionally protected. After giving several examples, such as the expression of unpopular political views or the request for trial by jury, the Court concluded:

If the aggravating circumstance at issue in this case had been invalid for reasons such as these, *due process of law would require that the jury's decision to impose death be set aside.*

(Italics ours.) *Zant,* 103 S. Ct. at 2747. *See also Barclay v. Florida,* ___ U.S. ___, 77 L. Ed. 2d 1134, 103 S. Ct. 3418 (1983).

The above language clearly restricts the admissibility of evidence relating to constitutionally protected behavior. Because the Court characterized the impermissible use of constitutionally protected behavior as a violation of due process, if the evidence in question allowed the jury to draw adverse inferences from a constitutional right, reversal of defendant's death sentence is required.

Here, the challenged evidence directly implicates defendant's right to bear arms. Const. art. 1, § 24 provides:

The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

This constitutional provision is facially broader than the Second Amendment, which restricts its reference to "a well regulated militia."[8]

Although we do not decide the parameters of this right, here, defendant's behavior—possession of legal weapons—falls squarely within the confines of the right guaranteed by

---

[8]Recent cases suggest that the federal right to bear arms may be more limited than our own provisions. *See Quilici v. Morton Grove,* 695 F.2d 261, 270 (7th Cir. 1982), *cert. denied,* 104 S. Ct. 194 (1983).

Const. art. 1, § 24.[9] Defendant was thus entitled under our constitution to possess weapons, without incurring the risk that the State would subsequently use the mere fact of possession against him in a criminal trial unrelated to their use. Our conclusion follows from the clear language of Washington's constitution. In addition, it coincides with the interpretation placed on a similar provision contained in the Oregon constitution. Oregon Const. art. 1, § 27 states:

> The people shall have the right to bear arms for the defence (sic) of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]

In *State v. Kessler,* 289 Or. 359, 614 P.2d 94 (1980), the Oregon Supreme Court held that this language protects the right of an individual to possess weapons. This ruling was reaffirmed in *State v. Blocker,* 291 Or. 255, 630 P.2d 824 (1981). In *Blocker,* the court noted that their constitution also protects the citizen's right to possess weapons outside the home. *See also* Comment, *The Impact of State Constitutional Right To Bear Arms Provisions of State Gun Control Legislation,* 38 U. Chi. L. Rev. 185 (1970).

Here, in arguing that defendant's exercise of that constitutional right meant that he deserved the death penalty, the State attempted to draw adverse inferences from defendant's mere possession of these weapons. Our constitution, and the due process analysis contained in *Zant,* prohibits use of this evidence.

Defendant's sentence of death must therefore be reversed.

---

[9]Notwithstanding the seemingly absolute language of the constitutional provision, this court has held that the right to bear arms "is subject to reasonable regulation by the state under its police power." *State v. Krantz,* 24 Wn.2d 350, 353, 164 P.2d 453 (1945). *Krantz* upheld a statute forbidding persons convicted of crimes of violence to possess pistols. Other states whose constitutions provide for a right to bear arms in similarly unlimited language have also held such a right subject to reasonable exercise of the police power. *Hyde v. Birmingham,* 392 So. 2d 1226 (Ala. Crim. App. 1980); *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975); *People v. McFadden,* 31 Mich. App. 512, 188 N.W.2d 141 (1971). For the reasons above, we need not decide the parameters of this right.

Defendant next argues that this evidence is both irrelevant and highly prejudicial. We agree. The guns in question had no connection with the crime and were all, admittedly, legally owned. We see no relation between the fact that someone collects guns and the issue of whether they deserve the death sentence. Furthermore, we take judicial notice of the overwhelming evidence that many nonviolent individuals own and enjoy using a wide variety of guns. This fact has no bearing on the issue of whether any of them deserve to live or die.

While the State urges that if this evidence was irrelevant, it was nonetheless nonprejudicial, we cannot agree with this proposition. Personal reactions to the ownership of guns vary greatly. Many individuals view guns with great abhorrence and fear. Still others may consider certain weapons as acceptable but others as "dangerous." A third type may react solely to the fact that someone who has committed a crime has such weapons. Any or all of these individuals might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns. This was, in fact, the crux of the prosecutor's argument to the jury for defendant's death. Consequently, we reject the State's argument that no prejudice resulted from admission of these weapons.

Because the challenged evidence was violative of defendant's due process rights, irrelevant and thus inadmissible, a new sentencing proceeding is required.

## X

Our disposition of this issue makes it technically unnecessary to reach the remaining challenges to the death sentence. One issue, that of the admissibility of the polygraph, has been already resolved above. For additional guidance of the trial court on remand, we will also address defendant's allegation that the jury was improperly instructed during the sentencing proceeding. He first attacks instruction 2 which states:

"Having in mind the crime of which the defendant

has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

If you unanimously answer "yes" the sentence will be death. If you do not unanimously answer "yes," or if you unanimously answer "no" the sentence will be life imprisonment without the possibility of parole.

In deciding the question posed, you may consider any relevant factors, including, but not limited to the following:

(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;

(2) Whether the murder was committed while the defendant was under the influence of extreme mental disturbance;

(3) Whether the victim consented to the act of murder;

(4) Whether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor;

(5) Whether the defendant acted under duress or domination of another person;

(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect;

(7) Whether the age of the defendant at the time of the crime calls for leniency; and

(8) Whether there is a likelihood that the defendant will pose a danger to others in the future.

Report of Proceedings, at 2579–81.

Defendant asserts that this instruction confused the jury by referring to mitigating factors of which there was no evidence, *i.e.*, factors 3, 5 and 6. Defendant also contends that the instruction was deficient because it did not mention other nonstatutory, mitigating factors of which there was evidence.

The challenged instruction adequately informed the jury that it could consider any mitigating factor and simply listed those mentioned by the statute. This was a correct statement of the law and allowed the jury to consider all of

defendant's evidence. Thus, the trial judge did not err in giving this instruction.

Defendant urges that it was also error not to give his sentencing verdict form because the one given by the trial judge did not require unanimity. Defendant's argument ignores that portion of instruction 2 which states that a unanimous answer to the special interrogatory will result in the death sentence, while a nonunanimous answer results in life imprisonment. This statement adequately informed the jury of the unanimity requirement.

Likewise, we find no error in the trial judge's refusing to give the defendant's supplemental instruction. That instruction informed the jury that it had no duty to reach a unanimous decision and that once one juror answered the special interrogatory in the negative, the jury had reached a verdict. The instruction defendant proposed is without authority and should not be given. Defendant's proposed instruction would stifle jury discussion concerning the death penalty and encourage its arbitrary and capricious imposition.

Finally, defendant assigns error to the trial judge's decision to allow the jury access to newspapers and television coverage of the case during the interim period between the guilt phase and the sentencing verdict. Our decision to remand this case for a new sentencing proceeding makes this issue moot. In future proceedings, however, we emphasize that trial judges must specifically instruct the jury that until the proceedings are *completed,* they should avoid any contact with news stories concerning the case.[10]

The judgment is affirmed, but the case is remanded for a new sentencing proceeding, with a new jury, in accordance with the principles set forth above, to determine whether

---

[10]This case was one of the first sentencing proceedings held under the provisions of RCW 10.95. As evident by the many issues discussed in this opinion, the statute presents difficult questions of interpretation. Thus, despite our conclusion that a new sentencing proceeding is appropriate, we wish to commend the trial judge for his able handling of a difficult case.

the death penalty should be imposed.

Dore and Dimmick, JJ., and Cunningham, J. Pro Tem., concur.

Williams, C.J., and Brachtenbach, J., concur in the result.

Dolliver, J. (concurring in the result)—I concur with the result of the majority and would also remand for a new sentencing hearing. There are three matters in which I disagree with the analysis of the majority.

## I

Since the imposition of the death penalty is reversed on other grounds, it is unnecessary for the court to reach the issue as to whether the death penalty violates Const. art. 1, § 14. Nevertheless, my position is contrary to that of the majority. I believe the death penalty does violate Const. art. 1, § 14. The views of the Supreme Court of California in *People v. Anderson*, 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152 (1972) on the issue of the death penalty as "cruel punishment" are congruent with mine.

In addition to citing *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) as authority for its views, the majority argues this court should not substitute its moral judgments for those of the people. It further points out the people of California amended their constitution subsequent to *People v. Anderson* so the death penalty was, in California, no longer deemed cruel.

I fully agree with the majority that the judiciary must defer to the moral judgments contained in our constitution. If the meaning and application of our Bill of Rights, and the judgments contained therein, were fully revealed, there would be no need for this court to sit on cases involving our Bill of Rights as the popular will would always be manifest. Unfortunately, the constitutional language defies this easy escape for the judiciary. Thus, rather than decline to articulate the meaning of the constitution and its application, it is the duty of this court to express its understanding of the

moral judgments rendered by the people in their constitution. If the people then believe the court is in error, the means to correct that error are available through the appropriate mechanism to amend our basic document. Const. art. 23.

Regardless of my views or the views of the majority, however, we need not determine the applicability of Const. art. 1, § 14. We should follow the long established practice of this court that when a case can be decided on other grounds we decline to consider constitutional issues. *Ohnstad v. Tacoma*, 64 Wn.2d 904, 395 P.2d 97 (1964).

II

Our decision in *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II) is directly contrary to the refusal of the majority to admit the polygraph of Monte Yovetich. *Bartholomew* II holds polygraph interrogations are admissible in the sentencing phase as evidence of mitigation. *Bartholomew* II, at 645–47. It was error for the trial court to refuse to allow the polygraph to be used by defendant.

III

I agree the evidence of defendant's gun collection should not have been admissible in the case in chief of the State at the sentencing stage. I do not agree that Const. art. 1, § 24 is the appropriate vehicle by which to reach this conclusion. While I do not necessarily disagree with the construction placed by the majority on this constitutional provision, I believe the analysis for the admissibility of evidence by the State at the sentencing hearing we adopted in *Bartholomew* II is directly on point. Evidence from the State of nonstatutory aggravating factors must be "limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant." *Bartholomew* II, at 642. The testimony on defendant's gun collection was submitted by the prosecution in its case in chief. It is inadmissible under

the rule in *Bartholomew* II. We need not reach Const. art. 1, § 24.

STAFFORD and PEARSON, JJ., concur with DOLLIVER, J., as to parts II and III.

Reconsideration denied August 7, 1984.